809 So.2d 184 (2001)
J.D. BARNETT, et ux.
v.
BOARD OF TRUSTEES FOR STATE COLLEGES AND UNIVERSITIES a/k/a University of Louisiana System.
No. 2000 CA 1041.
Court of Appeal of Louisiana, First Circuit.
June 22, 2001.
*185 Donald G. Kelley, Natchitoches, Dee Hawthorne, Melrose, for Plaintiff/Appellant, J.D. Barnett.
Winston G. DeCuir, Sr., Baton Rouge, for Defendant/Appellee, Board of Trustees for State Colleges and Universities.
Before: CARTER, C.J., WEIMER, and KLINE,[1] JJ.
CARTER, Chief Judge.
J.D. Barnett brought breach of contract and detrimental reliance claims against the Board of Trustees for State Colleges and Universities (the Board).[2] He alleged that the Board approved his promotion to Athletic director of Northwestern State University of Louisiana at Natchitoches (NSU) in June 1995, to take effect July 1, 1996, but that in late summer or fall of 1996, someone else was appointed as athletic director, in violation of the Board's *186 contract and promise to Barnett. The Board moved for summary judgment, alleging it had never taken any official action placing Barnett in the position of head athletic director, and thus there was no contract to be breached. It further alleged that Barnett could not have reasonably relied on a promise that he would be made head athletic director because he was well versed in both university procedures and policy and the Board's rules and regulations and knew the Board had to formally approve the promotion. Finally, it alleged Barnett's suit was prescribed because he filed suit more than a year after he learned that the university planned to advertise nationally to fill the position of head athletic director.
The trial court found the action was not prescribed but granted summary judgment and dismissed Barnett's claims based on the other grounds raised by the Board. Barnett appeals.
Barnett was hired as head men's basketball coach at NSU in March 1994, while Dr. Robert Alost was NSU's President. Tynes Hildebrandt, NSU's head athletic director, began talking about retiring around that time. Hildebrandt finally set a retirement date of June 30, 1996, and discussed this with Dr. Alost and Jerry Pierce, NSU's Vice President of External Affairs. Dr. Alost and Pierce formulated a plan whereby Hildebrandt and Barnett would become executive director of athletics and athletic director/head men's basketball coach, respectively, on July 1, 1995, and then Barnett would become full-time athletic director July 1, 1996, when Hildebrandt retired. Dr. Alost sent a letter to Barnett on January 31, 1995, which began: "This is to provide written confirmation of my decision to appoint you as Athletic Director of Northwestern State University effective July 1, 1995 pending, of course, the approval of the Board of Trustees for Louisiana Colleges and Universities."
Hildebrandt became unhappy with this plan before it was implemented, however. In May 1995 Dr. Alost decided to instead appoint Barnett as associate athletic director effective July 1, 1995, and athletic director July 1, 1996, when Hildebrandt retired. Pierce drafted a letter for Dr. Alost's signature that was sent to Dr. James A. Caillier, President of the University of Louisiana System, on May 18, 1995. According to Pierce, the purpose of the letter was to gain "some direction on how to go about doing an appointment over two different fiscal years." The letter requested that Barnett be appointed "as Head Basketball Coach and Associate Director of Athletics effective immediately, and as Athletic Director effective July 1, 1996." No salary adjustment was requested for the 1995-96 fiscal year. The letter stated that "[a] proposed salary for his appointment as Athletic Director beginning July 1, 1996, will be submitted at a board meeting in the Spring of 1996 and will be based upon state averages for the position at that time."
On June 2, 1995, Dr. Alost sent Dr. Caillier a letter requesting that the "attached personnel actions be placed on the agenda for the June Board Meeting." The action requested on the attached personnel-change form was a change from "Head Coach Men's Basketball Instructor" to "Head Coach Men's Basketball Associate Director of Athletics" with "Additional Duties No Salary Increase." The phrase "CONTINGENT UPON LETTER OF MAY 18, 1995, attached" is typed across the bottom of the form in the record, and stars were hand drawn in the boxes for "Salary Rate From" and "Salary Rate To." Pierce testified, however, that the stars and notation were not on the form when it left Dr. Alost's office. He assumed they *187 were placed there after the request went to the Board, after he had discussed with Dr. Caillier that personnel-change form had not been submitted as Pierce thought it would be.
The Board meeting was held June 29, 1995. On June 9, 1995, Dr. Caillier faxed Pierce a copy of Dr. Alost's June 2 letter, upon which was stamped: "Approved by the Board of Trustees for State Colleges and Universities on June 29, 1995 by: James A. Caillier System President." Included with the fax was the same personnel-change form attached to Dr. Alost's June 2, 1995, letter to Dr. Caillier, with the hand-drawn stars and the contingent phrase at the bottom. On July 18, 1995, Dr. Caillier sent a memorandum to the presidents of the universities governed by the Board, including Dr. Alost, stating, "For your information and file, attached are copies of personnel actions approved by the Board at its June 29, 1995 meeting." The form attached also contained the stars and the contingent phrase typed at the bottom.
Pierce testified in his deposition that he met with Barnett either the same day or two to three days after the June 29, 1995 meeting of the Board and advised him the July 1, 1996 appointment as athletic director had not been approved. Barnett does not controvert this testimony. Pierce testified he was "professionally and personally in favor" of Barnett becoming athletic director. Pierce stated he had assumed the head athletic director appointment would have been on the personnelchange form Dr. Alost submitted, but it was not. He stated he was not overly concerned, however, because there was still a year left in which Dr. Alost could submit a personnel-change form to the Board. He had discussions with Dr. Alost, questioning why it had not been included on the form submitted, and it was his understanding that Dr. Alost would submit the personnel-change forms required to appoint Barnett athletic director at a later date. He had further discussions with Dr. Alost on the subject, but then Dr. Alost announced he was retiring and would leave the athletic director appointment to the incoming president.
Dr. Randy Webb became acting president of NSU on May 13, 1996, and president on July 1, 1996. He testified he called Barnett into his office on May 14 and told him that he understood the Board had never officially appointed him athletic director, that he wanted to advertise the position nationally, and that he encouraged Barnett to apply. Barnett testified, however, that Dr. Webb did not tell him he was going to advertise, but only that he was considering doing so. On May 30, 1996, Dr. Caillier sent a letter to Dr. Webb that stated:
Although Dr. Alost's letter indicated his intent to subsequently recommend Mr. Barnett as Athletic Director effective in FY 1996/97, and although he stated that appropriate appointment forms and terms of the appointment would be submitted to the Board for its consideration in the Spring of 1996, no such forms and no formal request for appointment have been received by this office.
Accordingly, the Board has taken no action other than approving Mr. Barnett's appointment as Head Men's Basketball Coach and Associate Director of Athletics for the period May 19, 1995 through June 30, 1996. It will be necessary for you to make a recommendation to the Board relative to Mr. Barnett's position and salary effective July 1, 1996; by submitting the appro[p]riate Board Personnel Change Form(s).
Dr. Webb did not submit the appropriate forms to have Barnett named athletic director. The position was advertised nationally, *188 Barnett did not apply, and someone else was hired as athletic director.
The Board of Trustees for State Colleges and Universities is created by Article VII, Section 6, of the Louisiana Constitution. State universities governed by the Board, including NSU, comprise the University of Louisiana system. LSA-R.S. 17:3217. The Board is authorized to adopt rules and regulations necessary or proper for the government of the universities comprising its system. LSA-R.S. 17:3351 A(12). The university's president is authorized to appoint and fix the salaries and the duties of the members of the faculty and administrative and professional staff for the university he or she heads, subject to the recommendation of the president or chief administrative officer of the system and approval by the Board. LSA-R.S. 17:3305 A. Appointments for vice presidents, deans, and athletic directors, however, must "be submitted for approval by the Board as individual line items.... All terms and conditions of employment [must] be submitted to the System office for review." Rules of the Board of Supervisors for the University of Louisiana System, Rule C-III(II)(B).
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of every action. LSA-C.C.P. art. 966; Gaubert v. Toyota Motor Sales U.S.A. Inc., 99-2569, pp. 2-3 (La. App. 1st Cir.11/3/00), 770 So.2d 879, 881.
The burden of proof is on the mover. However, if the mover will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense. Thereafter, if the adverse party fails to provide factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. LSA-C.C.P. art. 966 C(2); Jarrett v. Capital Area Legal Services Corp., 99-0193, p. 3 (La.App. 1st Cir.3/31/00), 763 So.2d 698, 700, writ not considered, 01-0710 (La.4/12/01), 789 So.2d 601.
Barnett contends the trial court erred in granting summary judgment on his breach of contract claim because it was not addressed in the Board's motion. Although the motion itself does not use the phrase "breach of contract," the issue of whether a contract existed that the Board could have breached is raised in the uncontested fact statements filed by the parties and was thoroughly discussed and argued in the hearing on the motion. This argument is without merit.
Barnett also contends material issues of fact exist as to whether a contract was created by the Board at the June 29, 1995 meeting. Barnett claims that the hand-drawn stars and the contingent language added to the form indicated the Board had considered and accepted both personnel changes requested in the May 18 letter and "seemed very legal and contractual until there was an administration change in April of 1996 when Dr. Randy Webb was selected as President of NSU." *189 Barnett ignores, however, the uncontroverted testimony of Pierce that within three days of the June 29, 1995 Board meeting, he told Barnett he had not been approved as athletic director because Dr. Alost had not submitted the personnelchange form for that position.
There is no evidence that Barnett's change from associate athletic director to head athletic director was ever properly submitted to the Board as a line item as required by the Board's rules. In fact, there is no evidence that the change was submitted to the Board in any manner. Barnett contends the contingent language typed on the form means the "May 18, 1995 letter was a part of the line item form." Barnett, however, has submitted no evidence that the Board decided to violate its own rules by treating this letter, which did not contain specifics on salary, as part of the personnel-change form. Barnett has not even shown when or how this notation was added or that it was anything more than a reference to the statement in the letter that Barnett would receive no additional salary with his promotion to associate athletic director.
The Board has pointed out to the court that there is an absence of factual support for an element essential to Barnett's claim for breach of contract, i.e., that there was a contract. Barnett has failed to provide factual evidence sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. Thus, there is no genuine issue of material fact on this issue, and the trial court correctly granted summary judgment on the breach of contract claim.
Barnett raises detrimental reliance as an alternative theory of recovery and contends the trial court erred in granting the motion for summary judgment on his detrimental reliance claim. Louisiana Civil Code article 1967 provides in pertinent part: "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying."
Detrimental reliance or equitable estoppel is not favored in our law and is properly applied only to representations of fact. Morris v. Friedman, 94-2808, p. 9 (La.11/27/95), 663 So.2d 19, 25. In Morris, the supreme court recognized three elements required for the application of detrimental reliance: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. 663 So.2d at 25. The representation required for the application of this doctrine is usually characterized as a "misrepresentation," which generally implies intent and suggests deliberate falsification. Eicher v. Louisiana State Police, 97-0121, p. 7 (La. App. 1st Cir.2/20/98), 710 So.2d 799, 804, writ denied, 98-0780 (La.5/8/98), 719 So.2d 51. In Eicher, we stated that when invoking the doctrine against a governmental agency, a somewhat greater burden may be appropriate, which would involve (1) unequivocal advice from an unusually authoritative source, (2) reasonable reliance on that advice by an individual, (3) extreme harm resulting from that reliance, and (4) gross injustice to the individual in the absence of judicial estoppel. 710 So.2d at 804.
Barnett contends he was promised the athletic directorship by Dr. Alost and Pierce, was led to believe the Board approved his promotion, and reasonably relied on that promise. We find the trial court correctly dismissed Barnett's detrimental reliance claim, for several reasons. First, we note the letter of January 1, 1995, from Dr. Alost to Barnett confirming his decision to appoint him athletic director *190 contains this language in the first sentence: "pending, of course, the approval of the Board of Trustees for Louisiana Colleges and Universities." Barnett was made aware at the outset that Board approval was necessary. If he relied on Dr. Alost's promise before Board approval, such reliance was not reasonable. Second, Dr. Alost and Pierce are not defendants in this action, and any promises they may have made cannot be imputed to the Board.
Third, Barnett has not shown how he relied on the promise to his detriment. He contends he turned down a job offer at the University of South Alabama because he had been promised the athletic directorship at NSU. The letter he submitted in support of this claim from the athletic director at South Alabama is dated March 16, 1995, and begins, "This letter is forwarded to you, not as an offer of employment, but as an understanding that in the event the search process concludes and the University offers you employment ... the following general terms of the contract are agreeable to you ...." Barnett testified he was verbally offered the job some time in March 1995, contingent on Board approval, but he turned it down in reliance on information given him by Pierce that he would named NSU's athletic director. This was three months before the June 29 Board meeting. He also contends that he began building a house in late July or early August 1995 and made it larger, with more entertainment space, because of the promise that he would be athletic director. This was after the date Pierce advised him the Board had not confirmed his promotion, and thus any reliance would have been unreasonable. Furthermore, he makes no contention that he suffered any economic detriment by having a larger home than he had originally planned.
For the foregoing reasons, we conclude the trial court did not err in finding no genuine issues of material fact existed as to Barnett's breach of contract and detrimental reliance claims. The judgment of the trial court is affirmed at Barnett's costs.
AFFIRMED.
NOTES
[1] Hon. William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] His wife Susan Barnett joined in the suit but voluntarily dismissed her claims contemporaneously with the signing of the judgment in this matter dismissing her husband's claims.