**WATER CRAFT MANAGEMENT, L.L.C., et al.**

v.

**MERCURY MARINE(a Division of Brunswick Corporation), et al.**

No. CIV.A. 99–1031–B–M1.

United States District Court, M.D. Louisiana.

Aug. 12, 2004.

Andre G. Coudrain, Cashe Lewis Coudrain & Sandage, LLP, Christopher M. Moody, Moody & Moody, Hammond, LA, for Plaintiffs.

Craig Lewis Caesar, Anne Dorman LeJeune, B. Franklin Martin, III, Colvin G. Norwood, Jr., McGlinchey Stafford, PLLC, New Orleans, LA, for Defendants.

## RULING

POLOZOLA, Chief Judge.

Water. Craft. Management, L.L.C. ("Water Craft"), Douglas Wayne Glascock ("Glascock"), and Nick Martrain, III ("Martrain") have filed this suit against Mercury Marine (A Division Of Brunswick Corporation) ("Mercury") alleging violations of federal antitrust law under 15 U.S.C. § 13(a) and various state law claims, including breach of contract, detrimental reliance, fraud, and misrepresentation claims.[1] With the consent of the parties, the claims were trifurcated. The Court tried the antitrust claims and state law claims separately. A trial on the issue of damages will be held at a later date.

The antitrust claims were tried by the Court without a jury.[2] After hearing the evidence in this case, considering the credibility of the witnesses who testified in person at trial, and reviewing the briefs, deposition transcripts, and other arguments presented by the parties, the Court finds that plaintiffs failed to prove all of the elements of their federal antitrust claims by a preponderance of the evidence.[3] The Court further finds in the alternative, that even if plaintiffs did prove their antitrust claim, Mercury has proved as a matter of law under the facts of this case its meeting competition defense by a

---

1. The plaintiffs will sometimes be referred to collectively as Water Craft.

2. Rec. Doc. Nos. 315, 317, 319, and 320.

3. The Court issued a short opinion on the antitrust claim on March 9, 2004. See Rec. Doc. No. 365.

preponderance of the evidence which serves as a complete bar to plaintiffs' federal antitrust claims.

The state law claims were also tried before this Court without a jury.[4] After hearing the evidence on this claim,[5] the Court finds that: (1) plaintiffs have failed to prove all of the elements of their state law breach of contract claims by a preponderance of the evidence, and (2) plaintiffs have proven all of the elements of their state law claims based on detrimental reliance, fraud, and misrepresentation by a preponderance of the evidence. Accordingly, it is necessary for the Court to proceed with the trial of damages to determine the extent, if any, of the plaintiffs' damages sustained based on their state law detrimental reliance, fraud, and misrepresentation claims.

The state law counter-claims brought by Mercury were also tried before this Court without a jury.[6] The Court finds that Mercury has proven the following claims by a preponderance of the evidence:

(1) The sum of $79,117.32 plus interest and attorneys fees against Glascock and Martrain;

(2) The sum of $11,379.75 plus interest and attorneys fees against Water Craft, Glascock and Martrain;

(3) The sum of $3,855.12 against Water Craft, Glascock and Martrain;

(4) The sum of $6,076.67 against Glascock and Martrain;

(5) The sum of $26,576.94 against Glascock

Mercury is also entitled to recover interest from the date of judgment until paid on each of these claims.

The Court now proceeds to give reasons for the Court's rulings.

## I. Factual Background [7]

This case involves transactions between the manufacturers and dealers in the boating industry. Both of the plaintiffs, Glascock and Martrain, are experienced businessmen and marine dealers. Since 1986, Glascock owned six separate marine dealerships before opening LA Boating Center ("LA Boating") which did business as the Water Craft store in Baton Rouge. These dealerships were located in various parts of Louisiana. In some of these dealerships, Glascock had business partners. Glascock owned Hammond Boating Centre in Hammond, Louisiana, which opened in 1986 and operated as a Mercury dealership carrying Mariner motors. During the time Water Craft was a going concern, Glascock continued to run his Mercury dealership in Hammond, Louisiana. Glascock also owned other Mercury dealerships which were Tracker Marine ("Tracker") dealerships. During this time, he served on the Tracker Dealer Council and had been one of its top ten dealers for ten years. Thus, Glascock had been actively and successfully involved in the marine dealership industry for approximately twelve years at the time he and Martrain opened LA Boating in January 1997. The evidence also reveals that Glascock had served on several manufacturer-dealer councils in connection with the marine

---

4. Rec. Doc. Nos. 366, 367, and 369.

5. In reaching its decision the Court considered the credibility of the witnesses who testified in person at trial, and reviewed the briefs, trial and deposition transcripts, and the other arguments presented by the parties.

6. Rec. Doc. Nos. 366, 367, and 369.

7. The factual findings made by the Court apply to all claims unless the Court notes otherwise. All of the claims and contentions of the parties have been fully considered by the Court whether specifically discussed in this opinion or not.

products industry and was a member of several trade associations. In addition to Glascock's extensive experience in the marine product industry, Glascock owned and managed several other successful businesses and by his own admission, has become a millionaire because of his business activities and experience.

Martrain had over twenty years experience in the marine dealer industry before opening LA Boating in Baton Rouge. He also had served on numerous industry boards throughout that time, including the Advisory Council for Stratos Boat Company and the National Dealer Council for Outboard Marine Corporation ("OMC"). Before opening the Water Craft store, Martrain owned and managed a Baton Rouge OMC dealership, Martrain Marine, which opened in 1983. Martrain closed this dealership on October 31, 1996. It is clear that one of the primary reasons Martrain closed Martrain Marine was because of the extensive and robust competition in the Baton Rouge marine product marketplace. In October 1996, Martrain had agreed that he would sell his dealership's assets in Martrain Marine to Kenny Hebert ("Hebert") who owned Plaquemine Marine. It was also agreed that Hebert would lease the former Martrain Marine building from Martrain and his family.

Both Glascock and Martrain knew the Baton Rouge marine business market was highly competitive. Glascock had operated a Baton Rouge Mercury dealership carrying Mariner motors, and had closed the dealership in the early 1990's because the Baton Rouge market was too competitive. He sold that dealership to Travis Boating Center ("Travis"), which was an OMC dealer at the time. Travis would later become a very important party in this litigation.

## A. The Initial Negotiations

Both Glascock and Martrain testified that because they previously had bad experiences with the Baton Rouge marine market, they had no desire to open a Baton Rouge Mercury dealership. Though the motivation is disputed, Glascock and Martrain began to discuss the possibility of the two partnering to open a Mercury dealership in Baton Rouge in September 1996. Glascock contends he was approached by David Rohrbach, a sales representative for Mercury, in 1996 to discuss the possibility of opening a Baton Rouge Mercury dealership. Rohrbach eventually signed Water Craft d/b/a LA Boating to be a Mercury dealer. Rohrbach was assigned to the Louisiana territory from approximately April 1996 until he left his employment with Mercury in May 1997. During the course of Glascock's initial discussions with Mercury, he testified that he was very negative about opening a Baton Rouge Mercury dealership. However, in later discussions, Glascock testified that the Mercury representatives said they could make the offer very attractive, and put him in contact with Martrain to discuss a joint venture. At about the same time, Martrain testified that he was approached by Rohrbach and/or Glascock to discuss the possibility of entering into a joint venture with Glascock for a Baton Rouge Mercury dealership.

During their testimony, Glascock and Martrain contended that one of the initial and primary concerns they had about going into business again in Baton Rouge was the presence of Travis in the Baton Rouge market.[8] Both knew that Travis was receiving deep discounts from OMC and also knew it would be difficult for them to compete with Travis price-wise

8. As noted above, Glascock sold his prior Baton Rouge dealership to Travis, which was then an OMC dealer. As will be noted later in this opinion, Travis became a Mercury dealer after plaintiffs opened the Baton Rouge store and signed their agreement with Mercury.

unless certain price concessions could be obtained from Mercury. Glascock and Martrain were also concerned about the number of Mercury dealers already doing business in the Baton Rouge area. Finally, Glascock and Martrain stated that they both knew about Bill Seeley and John Randolph and their method of operation, and testified they had expressed this concern to Rohrbach personally. Both Glascock and Martrain expressed a concern that both Seeley and Randolph were Mercury executives, but had previously worked for OMC and were instrumental in signing Travis as an OMC dealer. Glascock and Martrain feared that Mercury now intended to make Travis a Mercury dealer because Travis was a fast-growing multi-location dealer for OMC, and Seeley and Randolph had been responsible for signing Travis to be an OMC dealer.

Glascock and Martrain claim that Rohrbach was quick to dispel these fears. According to plaintiffs, Rohrbach expressly advised them that Mercury would be providing LA Boating with the deepest possible discounts, and they would be able to buy boat motors as cheap or cheaper than anyone in the Baton Rouge market, including Travis. In addition, Glascock and Martrain claim Rohrbach made other promises to them concerning advertising co-op money and discounts on parts and supplies. Finally, Glascock and Martrain claim that Rohrbach and other Mercury representatives assured them that Travis would never be made a Mercury dealer. Throughout both bench trials, Glascock and Martrain testified that Mercury representatives had referred to Travis as being "public enemy number one," a statement Mercury emphatically denies Rohrbach, or any of its representatives, ever made.

Glascock and Martrain also claim that Rohrbach made representations to them that Mercury planned to reduce the total number of dealerships in the Baton Rouge market, and wanted to consolidate its business into one strong dealer who could effectively compete against Travis and allow Mercury to recapture its market share from OMC.

During the discussions with Glascock and Martrain, Mercury revealed that it was also adding Kenny Hebert of Plaquemine Marine as a dealer in the Baton Rouge market. However, Glascock and Martrain claim that this did not dissuade them from continuing negotiations with Rohrbach because they were advised by Mercury that Hebert would not become a "full-line dealer," but instead would be principally a "package" dealer. A full-line dealer is a dealer that purchases Mercury motors directly from Mercury and receives discounts off of a net dealer cost. Package dealers do not buy loose engines from Mercury, but rather obtain their inventory from boat dealers who sell them packaged units with the boat and motor already installed, or at least included, in the sale of the boat price. In Louisiana, a large share of the marine business is for loose engines since so many engines are sold to "repower" older or homemade boats.[9] A full-line dealer is one that can buy package units and loose engines and is free to create or set up his own package.

During the testimony, Mercury representatives presented an entirely different picture of these initial negotiations between Rohrbach, Glascock and Martrain. Mercury claims that it was Glascock who first expressed interest and approached Rohrbach about opening a Baton Rouge dealership. Rohrbach testified in his deposition that Glascock even told him about the location he was considering for the dealership. Rohrbach noted that the first time that he ever met Martrain was at a breakfast meeting and that he did not

---

**9.** This is partially caused by the salt water in the Louisiana marsh area.

suggest that Glascock approach Martrain about opening a Baton Rouge Mercury dealership. Although Rohrbach admits that Mercury was excited about Glascock and Martrain opening a Baton Rouge dealership, he testified that the opening of a Baton Rouge dealership was not tied to any special deal. To the contrary, Rohrbach and other Mercury representatives testified that Rohrbach did not have the authority to offer any special deals that were not in the standard dealer program, and to do so would have required approval from his superiors.[10]

Rohrbach testified that Travis did not play a major role in the negotiations he had with Glascock and Martrain regarding the Baton Rouge agreement. During the time he worked at Mercury, Rohrbach testified that he never learned that Mercury was considering entering into a contract with Travis to be a Mercury dealer. Thus, Rohrbach testified he would not have told any of the dealers he serviced whether or not there were discussions occurring between Travis and Mercury. Rohrbach claims he did not tell Glascock and Martrain that Mercury would reduce the number of Mercury dealerships in the Baton Rouge area, nor did he mention there were Baton Rouge dealerships which would be phased out by Mercury.

Mercury argues that the true motivating factor which caused Glascock to open another Baton Rouge dealership was to protect his Tracker dealership in Hammond. As noted above, Glascock's other Mercury dealerships were Tracker dealerships. Defendants contend that Tracker boat packages are outfitted with Mercury Motors. Thus, in order to sell Tracker boat packages, a Tracker dealer must also be a Mercury dealer. Mercury presented evidence that from late 1995 to early 1996, Tracker representatives, including David Camp and his supervisor Nick Vann, discussed the possibility of opening a Tracker store in Baton Rouge with Glascock. Tracker allegedly told Glascock that it would open another Baton Rouge dealership with another company if Glascock did not wish to do so. Mercury contends that Glascock's true motivation was to protect his then-current status of having the only Tracker dealership in the Baton Rouge area. This contention is supported by the evidence in the case.

## B. The Sales & Service Agreements

Despite the conflicting contentions set forth above regarding the initial negotiations between Rohrbach, Glascock and Martrain, it appears that an agreement was eventually reached. On October 31, 1996, Glascock and Martrain signed the lease for the building where they would operate LA Boating. On November 25, 1996, Glascock and Martrain formed Water Craft, and on November 28, 1996, Martrain, in his capacity as "President," signed a Mercury Marine Sales & Service Agreement ("the 1997 Sales & Service Agreement") on behalf of Water Craft, doing business as LA Boating in Baton Rouge. It is a stipulated fact that both Glascock and Martrain were familiar with the terms contained in the 1997 Sales & Service Agreement because of their prior experience in the marine business. It is also clear and undisputed that both Glascock and Martrain understood from their prior experience in the marine product industry that non-exclusive dealerships were the standard practice for marine engine dealers.

The parties have stipulated that the 1997 Sales & Service Agreement is non-exclusive. Further, the 1997 Sales & Service Agreement noted that the price determination of Mercury products would be based on price lists published by Mercury

---

**10.** There were obvious antitrust concerns about favoring one dealer.

from time to time, reserving to Mercury the right to revise the price lists and applicable discounts at any time. Finally, the 1997 Sales & Service Agreement contained an integration clause that provided that it was the "entire agreement" between the parties and "replace[d] all prior agreements between the parties." Additionally, this integration clause stated the 1997 Sales & Service Agreement could be amended or modified "only by written instrument signed by Mercury Marine and Dealer." Both Glascock and Martrain testified at trial that based on this agreement and their prior marine product experience, they did not believe that Water Craft would be the exclusive Mercury dealer in the Baton Rouge area.

Water Craft, doing business as LA Boating, began its operation as a marine dealership in January 1997. Martrain was the managing partner of Water Craft, and ran the day-to-day business, operations, and accounting of LA Boating. Glascock was not present in the LA Boating store very often and did not take an active role in the day-to-day management of the dealership. After the Water Craft Baton Rouge store had been opened for approximately eight months, Glascock, on behalf of himself, Martrain, and Water Craft, executed a renewal contract with Mercury ("the 1998 Sales & Service Agreement") on August 3, 1997. The terms of the 1998 Sales & Service Agreement are identical to those contained in the 1997 Sales & Service Agreement.[11]

As Glascock and Martrain were opening their Baton Rouge Mercury dealership, Kenny Hebert opened "Boats Unlimited," another Mercury dealership in Baton Rouge. Both Baton Rouge dealerships began operation around January 1, 1997 as full-line Mercury dealers approximately five miles from each other and approximately five to six miles from the Travis location. Hebert testified that he was not told by Rohrbach that both he and Glascock and Martrain would become Mercury dealers. Instead, he claims only one—not both—of them would be signed as a Mercury dealer. As noted above, Glascock and Martrain also did not think they would be competing with Hebert as full-line dealers in the Baton Rouge market. Mercury contends that both Glascock and Martrain knew they would be competing with Hebert prior to signing the 1997 Sales & Service Agreement. Rohrbach testified that he never made the "full-line" and "dual-line" distinctions to Glascock and Martrain, and Mercury produced emails at trial from Rohrbach to Mercury representatives indicating that both Hebert and Glascock and Martrain knew that both would be operating Baton Rouge Mercury dealerships.

## C. Negotiations Subsequent to the 1997 Sales & Service Agreement

Despite the fact that a signed sales and service agreement was entered into, Glascock and Martrain testified it was unclear at the outset of the agreement the precise "program" that Water Craft's Baton Rouge store would be operating under. There were numerous discussions and communications between Glascock and Martrain and Mercury representatives from January to April of 1997. Glascock and Martrain contend it was not until April that the ultimate program was agreed to. These discussions were presented during both bench trials, including during the testimony of Glascock, Martrain, and Randolph. Glascock and Martrain argue that these ongoing discussions were made part of the overall contract with Water Craft concerning the purchase

---

11. Because the terms of the agreements are identical, the Court will address arguments related to the validity of these agreements collectively.

of Mercury engines, and constituted a modification and extension of the earlier written agreement. In the alternative, Glascock and Martrain argue that these negotiations with Mercury representatives constituted separate agreements from those contained in the 1997 Sales & Service Agreement, and these subsequent agreements were not fully integrated into either the 1997 or 1998 Sales & Service Agreements.

In approximately March or April 1997, Glascock and Martrain met with Rohrbach, Randolph [12] and Bill Burns, the regional sales representative, for dinner at Juban's Restaurant and thereafter for cocktails at the Hilton Hotel bar. According to plaintiffs, the supposed purpose of this meeting was to resolve the issues left unaddressed in the 1997 Sales & Service Agreement and to visit the new dealership. Mercury disputes this contention and denies this was the purpose of the meeting. Glascock and Martrain testified that during dinner and at the hotel Randolph reassured both of them that Mercury did not intend to make Travis a Mercury dealer, and he would make sure they received the deepest possible discounts from Mercury to help Glascock and Martrain be the number one Mercury dealer in Baton Rouge. Martrain testified specifically that he "flat-out" asked Randolph at this meeting if Mercury was trying to make Travis one of its dealers, considering Randolph's prior dealings with Travis when he worked for OMC. Martrain testified that Randolph emphatically advised him in response to that question that Travis would not become a Mercury dealer, and that Mercury's plan was to compete directly with Travis in order to regain market share from OMC. Randolph, on the other hand, never fully denied making these promises to Glascock and Mar-

train as the Court expected him to do. During his testimony at the antitrust trial, Randolph was very noncommittal in testifying whether or not he had led Glascock and Martrain to believe that Mercury would not make Travis a Mercury dealer.

During this time period, Glascock and Martrain claim that Mercury, with the full knowledge and assistance of Randolph, was actively pursuing Travis. Eventually, Travis did become a Mercury dealer, and these alleged misrepresentations are pivotal to Water Craft's contract, detrimental reliance, fraud, and misrepresentation claims. This conflicting testimony is irrelevant to the Court's determination that plaintiffs failed to prove the required elements of their antitrust claim.

### D. Operation of LA Boating and Its Eventual Demise

LA Boating began its operations and its relationship with Mercury. It received free interest from Mercury for the first nine months it was in business, as do all new Mercury dealerships. However, LA Boating finished its first year of operation with more than a $70,000 loss. Glascock and Martrain claim that this was the projected loss for their first year of operation while Mercury takes the position that the store should have made a profit during its first year. The testimony and other evidence presented during the trials revealed that LA Boating should have made a profit during its first year according to its pro rata plan. Mercury presented evidence that almost immediately after opening, LA Boating fell behind on its floor-plan financing payments, and by the spring of 1998, LA Boating was on a COD basis with its suppliers. Mercury also presented evidence that, by 1998, LA Boating was "Sold

---

12. Randolph was Rohrbach's boss and Mercury's national sales director. As noted earlier, he had formerly worked for OMC and recruited Travis to sign an agreement with OMC.

and Unpaid" ("SAU") or sold out of trust on all its lines including Mercury Marine Acceptance Corporation ("MMAC"), Deutsche Financial, Tracker, Bayliner, and Bombardier. Mercury contends that LA Boating was selling product, and instead of paying its lenders and floor financiers, was diverting the proceeds to meet other obligations.

Because LA Boating had fallen behind in its payments to Mercury and MMAC, Mercury claims it had Glascock and Martrain sign a promissory note on April 14, 1998 in its favor in the amount of $29,519.90 to address LA Boating's outstanding debt. Additionally, by August 1998, LA Boating owed MMAC over $177,000, which began to send demand letters to LA Boating. Around this time, Glascock and Martrain testified that they were ready to close LA Boating because of these financial problems. In addition, Glascock and Martrain testified that there were rumors circulating in the marine industry that Mercury was going to make Travis a Mercury dealer. Glascock and Martrain stated they did not want to remain in business as a Mercury dealer if they had to compete with Travis. However, Glascock and Martrain claim that conversations with Jeanne Koenen of MMAC and Kurt Schmiedel, the Mercury zone representative who had replaced Rohrbach, convinced them otherwise. Specifically, Glascock and Martrain claim that Schmiedel assured them Travis would not become a Mercury dealer, and that Koenen promised them extra financing. Despite making these assurances to the plaintiffs in response to their direct question on the issue, Schmiedel testified that he knew during his contacts and conversations with Glascock and Martrain that Mercury was negotiating with Travis to become a Mercury dealer. According to Schmiedel, Mercury representatives had told him to just give the other Baton Rouge dealers "lip service" when questioned about a pos-

sible Mercury deal with Travis. Additionally, Glascock and Martrain testified about a meeting at a bank in which Glascock and Martrain were about to close the store. During this meeting, plaintiffs received a cellular telephone call from Koenen promising them extra financing from Mercury which convinced plaintiffs to keep the business open. Based on these specific assurances from Schmiedel and Koenen, Glascock testified that he put up an additional $50,000 in capital, and that he and Martrain decided not to close the Baton Rouge dealership.

In October 1998, the existence of a business relationship between Mercury and Travis became well-known to both Glascock and Martrain. On October 16, 1998, Travis signed its letter of intent to become a Mercury dealership. The testimony and other evidence presented at the trial established that some Mercury products were already at the Baton Rouge Travis dealership at this time although Travis did not officially become a Mercury dealer until January 1999. Glascock and Martrain claim that this was a direct contradiction to the reassurances they had received from Rohrbach, Randolph, and Schmiedel. Glascock also testified that Schmiedel apologized to them when Travis became a Mercury dealer. Mercury disputes the testimony set forth above and denies ever making any promise to Glascock and Martrain that it would not sign Travis as a Mercury dealer.

After Travis officially became a Mercury dealer, relations between Mercury and Glascock and Martrain began to sour, and Mercury engaged in a series of discussions and meetings with Glascock and Martrain in an attempt to save the financially troubled LA Boating and the relationship between the parties. The first of these meetings occurred on October 29, 1998 between Schmiedel, Glascock and Mar-

train. At this meeting, Glascock and Martrain claim they asked for extra financing to keep LA Boating afloat. Mercury's proffered evidence claims they discussed LA Boating's poor financial situation at this meeting and discovered that gross sales were down, and LA Boating was losing $40,000 a month in overhead while paying $20,000 a month in interest alone. Glascock and Martrain claim they made it abundantly clear that if LA Boating did not receive additional working capital quickly, the Baton Rouge dealership was going to close.

The second meeting and additional telephone negotiations occurred during November 1998. At a meeting held on November 17, 1998 between Koenen and Martrain, a non-interest bearing loan from Mercury for $350,000 was requested. The testimony regarding this request and meeting is highly disputed. Koenen testified Martrain requested the loan, and she made no promises that the loan would be approved because the loan request was unprecedented. She noted that the request essentially asked that Mercury assist plaintiffs in paying off delinquent debts that the plaintiffs owed to Mercury and other lenders. Koenen also testified that she would never, in these negotiations or in any of the other negotiations she had with Glascock and Martrain, have had the authority to bind Mercury or MMAC to make any loan to them. Glascock and Martrain testified that Koenen had suggested the loan request, and that in his experience as a marine dealer, loans like that requested were commonplace. In fact, Martrain testified at the antitrust trial that he told Koenen he was in no position to suggest interest rates, and it was Koenen who specifically suggested a zero interest rate.

The loan request was subsequently denied by Mercury, and on December 7, 1998, Water Craft closed its LA Boating store. Mercury denies any of its actions or inactions caused the losses sustained by LA Boating. It argued and also presented evidence to show that absenteeism on the part of Glascock and Martrain, too much inventory, a general downturn in the marine products market, and LA Boating's inability to meet lawful competition all contributed to LA Boating's failure. Glascock and Martrain disagree, and argued and presented evidence that the losses sustained by LA Boating and its ultimate closure were attributed to Mercury's anti-competitive behavior in allegedly promising plaintiffs that Travis would not become a Mercury dealer [13] and the misrepresentations made by Mercury representatives to Glascock and Martrain during the formation and operation of LA Boating.

### E. The Slidell and Hammond Stores

Because the principal claim and counter-claim relate to Glascock's other stores in Slidell and Hammond, the Court must address the Slidell and Hammond stores owned by Glascock before applying the law to the facts of this case. With regard to the principal claim, Glascock and Martrain claim that Glascock's "Hammond Boating Center" and their Slidell store were both affected by the closure of LA Boating. Basically, the plaintiffs claim these stores sustained severe credit problems because of the extra slack they had to pick up during the liquidation and debt collection processes related to LA Boating's closure.

In its counter-claim, Mercury claims that the debts owed to it by the Slidell store are Water Craft debts recoverable in this lawsuit. In January 1998, Water

---

**13.** In essence, plaintiffs are arguing that Mercury was going to violate the antitrust laws against Travis to give plaintiffs the entire market and keep Travis out. The court assumes it would then be trying an antitrust suit filed by Travis.

Craft acquired the assets of another dealership, Boating Centres, Inc. d/b/a Slidell Boating Centre, which was owned in part by Glascock. Glascock owned the building in which the Slidell dealership was located, and Water Craft leased the building from Glascock. To accomplish the transfer from Boating Centres, Inc., Martrain paid $125,000 to Glascock, and Glascock transferred the assets of Boating Centres, Inc. d/b/a Slidell Boating Centre to Water Craft d/b/a Slidell Boating Centre. On February 11, 1998, Martrain signed a Sales & Service Agreement with Mercury on behalf of Water Craft, doing business as "Slidell Boating Centre," in Slidell. The terms of this Sales & Service Agreement are virtually identical to the Sales & Service Agreements that LA Boating signed with Mercury.

At the time LA Boating was closing and liquidating, the Slidell store showed a profit of $77,682.68 in 1998. Further, the parties have stipulated that Slidell was not part of the Baton Rouge marine products market area, and the Baton Rouge Travis dealership had no influence on the Slidell market. In July 1999, Water Craft sold the Slidell dealership to a third-party, SS Marine, Inc.

## II. Law and Analysis

### A. Antitrust Claims

The plaintiffs have filed this secondary-line injury antitrust claim pursuant to 15 U.S.C. § 13(a) which provides in part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: ... *And provided further,* That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade: *And provided further,* That nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the marketability of the goods concerned, such as but not limited to actual or imminent deterioration of perishable goods, obsolescence of seasonal goods, distress sales under court process, or sales in good faith in discontinuance of business in the goods concerned.

The Fifth Circuit follows the United States Supreme Court and other circuits in making a distinction between primary-line injury and secondary-line injury in claims under the Act.[14] Primary-line injury occurs at the level of direct competition and customarily results when a seller uses predatory pricing policies to enhance his market position over competi-

---

14. *Lycon, Inc. v. Juenke,* 250 F.3d 285, 288 (5th Cir.), *cert. denied,* 534 U.S. 892, 122 S.Ct. 209, 151 L.Ed.2d 148 (2001); *Eximco, Inc. v. Trane Co.,* 737 F.2d 505, 515 (5th Cir.1984).

tors, thereby diminishing competition and increasing market concentration.[15] Secondary-line injury occurs when a large purchaser uses its vast purchasing power to obtain low prices from the manufacturers or distributors whose products it stocks, thereby enabling it to undersell competitors.[16] A secondary-line injury occurs when competition between favored and disfavored purchasers of a discriminating seller is unlawfully affected.[17] The parties agree, and the Court finds, that this case is clearly a secondary-line injury case. A plaintiff alleging secondary-line injury must prove that a seller made a sale to two different buyers at the same functional level of competition charging different prices to each.[18]

To establish illegal secondary-line price discrimination between purchasers, a plaintiff must prove the following elements by a preponderance of the evidence: (1) sales made in interstate commerce; (2) the commodities sold to purchaser were of the same grade and quality as those sold to other purchasers; (3) that seller discriminated in price between purchasers; and (4) that the discrimination had a prohibited effect on competition.[19] A plaintiff who meets the above requirements establishes a prima facie case of price discrimination. In addition to the above requirements, the plaintiff has the burden of proving the extent of his actual injuries to recover damages.[20]

A price discrimination within the meaning of § 13(a) is merely a "price difference."[21] More specifically, price discrimination is defined as charging different buyers different prices for the same items. A plaintiff in a secondary-line injury action must prove actual instances of price discrimination. If the challenged lower price is in fact, and not merely theoretically, made available to the allegedly disfavored purchaser, the seller cannot be held liable under the Act.[22]

The "prohibited effect on competition" element is usually defined by courts by directly quoting the language of the statute which says ". . .may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."[23] This language focuses on two general effects under this portion of the Act—the effect on the general competitive market and the effect on the individual competitors or the disfavored purchaser. With respect to the effect on the general competitive market, the Act does not re-

---

**15.** The courts have gone further to identify third-line injury and fourth-line injury, but such explanations are not necessary since this is an undisputed secondary-line injury case.

**16.** *Eximco, supra* at 515.

**17.** *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 2543, 110 L.Ed.2d 492 (1990).

**18.** *Eximco, supra* at 515.

**19.** *Texaco, supra* at 556, 110 S.Ct. at 2543; *Lycon, supra* at 288.

**20.** *Texaco, supra* at 556, 110 S.Ct. at 2543.

**21.** *Texaco, supra* at 557, 110 S.Ct. at 2543–44.

**22.** *Metro Ford Truck Sales, Inc. v. Ford Motor Co.,* 145 F.3d 320, 326 (5th Cir.1998), *cert. denied,* 525 U.S. 1068, 119 S.Ct. 798, 142 L.Ed.2d 660 (1999). In *Metro Ford,* a vehicle dealership claimed price discrimination under the Act because of a competitive price assistance program used as a discount incentive for all of its dealers. The plaintiff dealer failed to demonstrate that the same level of discount was not available to all dealers, and the court concluded the dealership was treated the same as all other dealers with respect to discounts.

**23.** 15 U.S.C. § 13(a).

quire that the discrimination in fact have harmed competition. Instead, the Act requires the plaintiff show there is a reasonable possibility that the price difference may harm competition. This reasonable possibility of harm is usually referred to as competitive injury. Once the plaintiff proves a discrimination in price, the burden then shifts to the defendant to negate competitive injury. Unless rebutted by one of the Robinson–Patman Act's affirmative defenses, a showing of competitive injury as part of a prima facie case is sufficient to establish a claim under the Act.[24]

■ Where the plaintiff claims the effect is on the individual competitors or the disfavored purchaser, the burden of proof is greater. This standard was set forth by the United States Supreme Court and the Fifth Circuit Court of Appeals in *Chrysler Credit Corp. v. J. Truett Payne*.[25] In *Chrysler*, the United States Supreme Court held "[t]o recover treble damages[,]...a plaintiff must make some showing of *actual injury* attributable to something the antitrust laws were designed to prevent. It must prove more than a violation of [the Act], since such proof establishes only that injury may result."[26] On remand, the Fifth Circuit held that Chrysler had not violated the Act under the Supreme Court's standard by offering the product at different prices based on incentives. According to the Fifth Circuit, the Supreme Court standard requires a plaintiff to demonstrate by a preponderance of the evidence that an ac-

tual antitrust violation has caused his damages. The plaintiff in *Chrysler* simply had not done this because there was a question as to whether discrimination even existed because the challenged plan was available to all dealers. The Fifth Circuit further held that conclusory statements by the plaintiff, without evidentiary support of actual causation, was not sufficient to meet the burden of proof.[27] This case is extremely important because it illustrates what is now required of a plaintiff to prove a "prohibited effect on competition." The "prohibited effect on competition" element of the prima facie case requires a showing that the discrimination have *caused* an *actual injury* to the disfavored purchaser as a prerequisite for recovery under the federal antitrust laws.

■ Causation under the "prohibited effect on competition" element is established by examining two things: whether the favored and disfavored buyers were in actual competition with each other and proof of injury. Thus, to establish competitive injury in a secondary-line case, the disfavored purchaser must prove that it was engaged in actual competition with the favored purchasers at the time of the price discrimination. This actual competition requirement is satisfied by showing the competitors competed at the same functional level and within the same geographic market.[28] Plaintiffs rely on *FTC v. Morton Salt Co.*,[29] in support of their argument that plaintiffs have a lesser burden of proof on the second component of causation, proof of injury. Under *Morton Salt*,

24. *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–35, 103 S.Ct. 1282, 1288–89, 75 L.Ed.2d 174 (1983).

25. *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

26. *Id.* at 562, 1927, 101 S.Ct. 1923.

27. *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581 (5th Cir.1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

28. *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 585 (2d Cir.1987).

29. 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948).

an injury to competition is established by proof of a "substantial" price discrimination between competing purchasers over time. However, the Court finds that *Morton Salt* is not applicable under the facts of this case.[30]

Thus, in summary, to establish illegal secondary-line price discrimination between purchasers, a plaintiff must prove the following elements: (1) sales made in interstate commerce; (2) the commodities sold to purchaser were of the same grade and quality as those sold to other purchasers; (3) that the seller discriminated in price between purchasers; and (4) that the discrimination had a prohibited effect on competition. A price discrimination within the meaning of § 13(a) is an actual price difference. The "prohibited effect on competition" element of the prima facie case requires that the discrimination have *caused* an *actual injury* to the disfavored purchaser. Causation is established by examining whether the favored and disfavored buyers were in actual competition with each other and proof of injury. Actual competition requires that the plaintiff prove a relevant product and geographic market to be defined. Proof of injury to competition is established prima facie by proof of a "substantial" price discrimination between competing purchasers over time.

The Court finds that plaintiffs have failed to establish liability under the Robinson–Patman Act. Specifically, plaintiffs failed to satisfy their prima facie case because they have not shown an actual injury to a disfavored purchaser because of a violation of the federal antitrust laws. Also, plaintiffs did not prove that they were in actual competition with Travis. The Court also finds that a relevant geographic and product market was not established by the testimony and evidence presented in this case. Finally, the Court finds, in the alternative, that Mercury satisfied the elements of the meeting competition defense which precludes liability in a claim filed under the Robinson–Patman Act. The Court now turns to a more detailed discussion of the evidence to set forth why plaintiffs failed to satisfy their burden of proof on the antitrust claims.

1. Failure to Establish Causation or Injury to Competition

The Court discussed the causation element set forth in *Chrysler Credit Corp. v. J. Truett Payne Co.*[31] earlier in this opinion. Because of its importance and applicability to this case, the Court believes further discussion is required. In *Chrysler*, the manufacturer, Chrysler, offered nineteen sales incentive programs to its Birmingham dealers in which the dealers would receive bonuses based on either the number of retail sales or wholesale purchases in excess of an objective set by Chrysler. The dealer, J. Truett Payne, was the long-time dominant dealer in Birmingham, and consequently, Payne's objective was set higher by Chrysler.[32] Payne failed to meet its objective, received less bonuses than other area dealers, and eventually went out of business. As a result, it claimed the disparity in bonus payments constituted price discrimination that had resulted in its loss of profits, and sued Chrysler under Section 4 and 2(a) of the Clayton Act, as amended by Robinson–Patman Act.[33] In response to plaintiffs'

---

30. *See Borden Company v. FTC*, 381 F.2d 175 (5th Cir.1967), which required a competitive advantage by which competition could be injured and that one customer be favored over another.

31. 670 F.2d 575 (5th Cir.1982), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

32. *Chrysler, supra* at 579.

33. *Id.* at 577, 579.

contentions, Chrysler argued that the sales incentive programs were nondiscriminatory, had no effect on competition, and did not injure Payne because the programs were available to all dealers on a nondiscriminatory basis.[34] In an earlier opinion, the Fifth Circuit had ruled in favor of Chrysler at the directed verdict stage,[35] and reasoned that Payne had failed to introduce evidence of an injury attributable to Chrysler's alleged price discrimination. In that same opinion, the Fifth Circuit had also found that price discrimination which threatens competition, but does not cause actual competitive injury, will not support an action for damages. On review, the United States Supreme Court vacated and remanded the case for further proceedings. The Supreme Court ordered the Fifth Circuit to review the record for specific evidence in the record of violations of the price discrimination law, injury, or damages using the following standard: To recover treble damages, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent; it must prove more than a violation of Section 2(a), since such proof establishes only that injury may result.[36]

In determining if a violation of the Robinson–Patman Act occurred on remand, the Fifth Circuit first concluded that in order to recover treble damages under Section 4 of the Clayton Act, a plaintiff must prove (1) a violation of the antitrust laws; (2) cognizable injury attributable to the violation; and (3) at least the approximate amount of the damage.[37] Next, the Court identified this as a secondary-line injury case, and found the plaintiff must demonstrate the likely effect of the alleged price discrimination was to allow a favored competitor to draw significant sales or profits away from the disfavored competitor.[38] Considering these standards, the Court next turned to Payne's evidence and found that speculative and unsupportive testimony during the trial did not link the incentive programs to Payne's failure to compete with dealers in the Birmingham area. The Court further found that Payne could not benefit from the *Morton Salt* inference because it was not available to a plaintiff who had not proven the elements that support the inference.[39] Thus, the Court held that no violation of the Robinson–Patman Act had occurred.[40]

The Court then turned to the cognizable injury requirement, and held that a plaintiff must demonstrate an antitrust injury by a preponderance of the evidence in addition to the violation of the Act requirement. The Court also found that the plaintiff had the burden of establishing this standard "as a matter of fact and with a fair degree of certainty." The Fifth Circuit specifically held that conclusory statements alone, without evidentiary support, will not satisfy this standard. After reviewing the record, the Court characterized Payne's evidence as speculative and unsupportive, and found the evidence insufficient to demonstrate actual injury attributable to something the antitrust laws were designed to prevent.[41] Thus, the "prohibited effect on competition" element

34. *Id.* at 579.

35. Today, this would be judgment as a matter of law stage.

36. *Id.* at 578.

37. *Id.* at 579.

38. *Id.* at 580.

39. *"Morton Salt* upheld an inference of likely injury from the fact of substantial price differ-

ences granted to market leaders in a highly competitive market in which minor price differences significantly affected competitors' low profit margins." *Id.* at 581. The Court discussed the *Morton Salt* inference earlier in this opinion.

40. *Id.* at 581–82.

41. *Id.* at 581–82.

of the prima facie case requires a showing that the discrimination has caused an actual injury to the disfavored purchaser that is attributable to an alleged violation of the antitrust laws before treble damages under the Robinson–Patman Act may be awarded.

■ This Court finds that the testimony and evidence presented in this case is speculative and conclusionary as to Mercury's alleged violation of the antitrust laws. Plaintiffs have not presented any evidence to demonstrate an actual injury attributable to something the antitrust laws were designed to prevent. Even under a liberal interpretation of the legal standard and facts of this case, Travis did not enter the marketplace as a competing Mercury dealer until two months before the plaintiffs' Baton Rouge dealership closed. Travis signed the letter of intent to become a Mercury dealer on October 16, 1998, and the testimony supports a finding that there were Mercury products on the site of the Baton Rouge Travis dealership at this time. Travis officially became a Mercury dealer under the contract effective January 1999. LA Boating closed its doors on December 7, 1998 and began its liquidation process. These dates illustrate that LA Boating only competed with the Baton Rouge Travis dealership for this short two month period if it competed at all. Even if Mercury had violated the antitrust laws by offering greater discounts to Travis, it would be difficult to conclude that the losses sustained by Water Craft were attributable to such a violation when it had competed with Travis for such a short period of time.

It is even more difficult to prove that Water Craft's losses were attributable to Mercury's alleged violation of the antitrust laws because the testimony and evidence presented at the trial supports a finding that other reasons led to the eventual demise of the LA Boating store. LA Boat-

ing operated its first year without Travis as a competing Mercury dealer, and still sustained a $70,000 loss. This outcome occurred despite the business's pro rata business plan which had projected a profit of over $370,000 for the first year. Correspondence dated before Travis became a Mercury dealer was offered into evidence made references to a "bad year" for LA Boating, and also contained references to hurricanes and a general downturn in the market as reasons for Water Craft's economic troubles. Glascock himself admitted during his testimony that there had been a downturn in the market at the same time that LA Boating revenues were declining. Finally, the evidence establishes that the LA Boating store was in serious trouble by August 1998, months before Travis had even signed the letter of intent to become a Mercury dealer. By this time, Glascock and Martrain had already decided to shut down their failing dealership, even without any competition from Travis as a Mercury dealer. In addition, financial specialists were already very concerned about the fact that LA Boating was classified as being SAU. This meant they were selling products out of inventory, but using the proceeds to pay off other creditors instead of the creditor which had provided the inventory.

Considering these facts, the Court finds that Water Craft's injuries and the closing of the LA Boating store were not attributable to Mercury's offering deeper discounts to Travis. The period of competition between Travis and LA Boating was too short to support a finding that all of the injuries Water Craft alleges it sustained are attributable to Mercury's alleged violation of the antitrust laws. There are simply too many other reasons that caused the eventual closing of Water Craft. Thus, plaintiffs have not established causation between the actual injury sustained by Water Craft and Mercury's alleged violation of the antitrust laws.

2. Failure to Establish a Geographic and Product Market

■ Plaintiffs also failed to prove a prima facie Robinson–Patman claim because they failed to offer testimony or other evidence that adequately defined the relevant geographic and product markets as well as the product itself. It is well settled that the relevant product and geographic markets must be defined with some degree of precision to enable the trier of fact to determine if federal antitrust laws have been violated.[42] In this case not only did plaintiff fail to establish the requisite geographic markets, it failed to establish what product was involved. As noted earlier, there are dealers which just sell engines, there are package dealers, and dealers which act as full-line dealers.[43] Plaintiff failed to establish which, if any, of these products constituted the relevant product market.

In *Apani Southwest, Inc. v. Coca–Cola Enterprises, Inc.*,[44] a purified water manufacturer filed suit seeking damages for violations of several antitrust statutes including the Clayton Act, the Sherman Act, and Texas antitrust law. The district court dismissed the antitrust claims because the manufacturer had failed to prove a relevant geographic market. The Fifth Circuit affirmed.[45]

■ In affirming the district court, the Fifth Circuit required that a relevant geographic and product market be proven in order for a prima facie case of Clayton and Sherman Act violations to be established.[46] The Court also set forth the standards required to properly prove what the relevant product and geographic markets were. With regard to product market, the Court considered the extent to which the seller's product is "interchangeable in use" and the degree of "cross-elasticity" of the demand between the product itself and its substitutes. Factors used in this analysis include public recognition of a submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.[47]

■ In defining the relevant geographic market, the Court stated the standard was the area of effective competition charted by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies. Also, the relevant geographic market should correspond to the commercial realities of the industry and be economically significant. The geographic market can be the entire nation, or it could be as small as a single metropolitan area.[48] The factors to consider in determining the economic significance of the relevant geographic market include the size, cumbersomeness, and other characteristics of the relevant product; regulatory constraints impeding the free flow of competing goods into the area; perishability of products; and transportation barriers.[49] The eco-

---

42. *Olympia Co., Inc. v. Celotex Corp.*, 597 F.Supp. 285, 293 (E.D.La.1984)(Schwartz, J.), *aff'd*, 771 F.2d 888 (5 th Cir.1985), *cert. denied*, 493 U.S. 818, 110 S.Ct. 73, 107 L.Ed.2d 39 (1989).

43. *See* Section I(A) of this opinion, *supra*.

44. 300 F.3d 620 (5th Cir.2002).

45. *Id.* at 623–24.

46. *Id.* at 625, 627.

47. *Id.* at 626.

48. "An area containing only a small percentage of business activity may qualify as being economically significant if the relevant competition in that specific area is insulated from equivalent competition elsewhere." *Id.* at 627.

49. *Id.*

nomic significance of the relevant geographic market does not depend on singular elements such as population, income, political boundaries, or geographic extent. Rather, it depends on the relationship between these elements and the characteristics of competition in the relevant product market within a particular area.[50]

After setting forth the requirements for an antitrust plaintiff to prove the relevant geographic and product markets, the Fifth Circuit dismissed all of the antitrust claims in *Apani* because the plaintiff had failed to define a relevant geographic market. According to the Court, where a plaintiff fails to define a relevant market or alleges one that is insufficient, the antitrust claims must be dismissed.[51] The decision in *Apani* illustrates that failure to adequately define the relevant geographic and product markets is fatal to an antitrust claim in the Fifth Circuit.

Courts consistently require that expert testimony adequately define the relevant geographic and product markets in antitrust cases. Plaintiffs failed to present such expert testimony in this case. In *Surgical Care Center of Hammond, L.C. v. Hospital Service District No. 1 of Tangipahoa Parish,*[52] the Fifth Circuit affirmed a district court's dismissal of antitrust monopolization and tying claims because the plaintiff had failed to define a relevant geographic market.[53] In determining that the plaintiff failed to define a relevant geographic market, the Court held that the preliminary inquiry in an antitrust case is whether the defendant possesses market power in a relevant market. This inquiry requires a clear definition of the relevant geographic market.[54] Geographic evidence must take into account where consumers can practicably go, not where they actually go. Thus, a plaintiff cannot rely solely on a competitor's service area to compose the geographic market. This is exactly what the Fifth Circuit found the plaintiff had done. Instead, the Court said a plaintiff would fail to meet its burden of establishing a geographic market unless it showed where a consumer could practicably go.[55]

In *Surgical Care*, the reason why the plaintiff had failed to show the elements necessary to prove geographic market was attributed to the inadequate testimony of the expert. In noting the expert had failed to define a relevant geographic market, the Court stated:

Nevertheless, St. Luke's expert did not attempt to identify the hospitals or clinics that may be deemed competitors of North Oaks. He relied solely on what he defined as North Oaks's service area to compose the geographic market. Absent a showing of where people could practicably go for inpatient services, St. Luke's failed to meet its burden of presenting sufficient evidence to define the relevant geographic market. Without a proper market definition, St. Luke's could not establish the predicate of a monopolistic leveraging claim, i.e., market power in the market for inpatient hospital services, and thus could not show a dangerous probability that North Oaks would gain monopoly power in the outpatient surgery market. The district court, after carefully analyzing the reports presented by experts for both St. Luke's and North Oaks, found that St. Luke's had not adduced sufficient evidence to delineate the relevant geo-

---

50. *Id.* at 626–27.

51. *Id.* at 628.

52. 309 F.3d 836 (5th Cir.2002).

53. *Id.* at 840, 842.

54. *Id.* at 839.

55. *Id.* at 840.

graphic market. St. Luke's counters that a detailed analysis of the relevant geographic market is not necessary ...We hold that the district court did not err in dismissing St. Luke's claims of attempted monopolization because St. Luke's failed to meet its burden of presenting sufficient evidence to define the geographic market.[56]

Similarly, in *Lantec, Inc. v. Novell, Inc.*,[57] the Tenth Circuit affirmed a district court's dismissal of antitrust claims because the relevant geographic and product markets had not been established by proper expert testimony.[58] The Court first noted that a relevant market had to be established in order for the plaintiff to prevail in an antitrust suit. A relevant market is made up of the product at issue and available substitutes for that product. In defining the relevant market,[59] two aspects must be considered: the product market and the geographic market.[60] In reviewing the expert testimony, the Court found that the expert used unreliable data; failed to understand the product or the product market; did not conduct or cite surveys revealing consumer preferences; did not calculate the cross-elasticity of demand to determine which products were substitutes; gave a different opinion from that he gave in an earlier expert report; and failed to address changes in the product market.[61]

■ The Court also rejected the plaintiff's after-the-fact attempts to use the record to define a geographic market because of flaws in the expert's testimony. The Court held that "skimpy evidence" of one's own experiences in the market was not sufficient to support a worldwide geographic market.[62] The Tenth Circuit's analysis illustrates that courts place a high value on expert testimony and reports in determining whether the relevant geographic and product markets have been proven. It is also clear that the Court in *Lantec* refused to permit a plaintiff to use facts in the record to establish the relevant geographic and product market where the expert has failed to do so.

In *Bailey v. Allgas, Inc.*,[63] the Eleventh Circuit also adopted a requirement that adequate expert testimony is required to define the relevant geographic and product market to a claim brought under the Robinson–Patman Act. In *Bailey*, the plaintiff brought a primary-line price discrimination lawsuit under the Robinson–Patman Act. The district court found that the expert's methodology failed to meet the *Daubert* standard and granted the defendant's motion for summary judgment.[64]

The Eleventh Circuit held, as does the Fifth Circuit, that defining a relevant market requires expert identification of both the product at issue and the geographic market for that product. According to the

56. *Id.* (Citations omitted.)

57. 306 F.3d 1003 (10th Cir.2002).

58. *Id.* at 1027, 1030–31.

59. The Court divided its analysis into the evidence presented by both expert and lay testimony when it determined that no relevant geographic market had been defined.

60. *Id.* at 1024.

61. The expert was also criticized for relying heavily on his own personal experiences and personal conversations with consulting firms in a limited geographic area to define a worldwide market. *Id.* at 1025–26.

62. Despite factual evidence in the record that illustrated where the product was sold, the Court held the plaintiff had failed to establish a worldwide geographic market with this mere evidence in the record. *Id.* at 1026–27.

63. 284 F.3d 1237 (11th Cir.2002).

64. *Id.* at 1239.

Eleventh Circuit, construction of the relevant market requires expert testimony,[65] and where an expert fails to provide a sufficient basis upon which a relevant market can be defined, a Robinson–Patman claim fails.[66] The Eleventh Circuit found that the expert failed to define the product because he failed to analyze substitutes for the relevant product, conduct surveys of homes in the geographic area, or determine the cross-elasticity of the product.[67] The Court also found that the expert had failed to identify the relevant geographic market because he only defined it as the intended area of service instead of properly assessing all of the factors that must be considered when measuring the relevant geographic market.[68]

■ Applying the above jurisprudence to the facts of this case, the Court finds that the expert testimony offered by plaintiffs did not properly establish a relevant geographic and product market.

Dr. Stuart Wood was tendered as an expert by the plaintiffs in this case, and he openly admitted the deficiencies in his opinion and analysis during cross-examination. It is clear that Dr. Wood did not analyze or set forth the necessary factors required by the jurisprudence to prove a geographic market. Specifically, Dr. Wood did not examine where the consumers of the product went to purchase outboard motors or where exactly the consumers were buying their product. Instead, Dr. Wood testified that he felt the geographic market was tacit in this case because LA Boating was located only a short distance from the Baton Rouge Travis dealership. This tacit finding is not supported by the jurisprudence. The relevant cases clearly illustrate that the determination of a geographic market is more complex than the mere distance between two competitors. Thus, the Court finds that Dr. Wood's assumption that the geographic market in this case was tacit is an incorrect assumption as a matter of law. This incorrect finding fails to support a critical element plaintiff must prove in their antitrust claim.

Dr. Wood also failed to conduct the analyses required by the jurisprudence to properly establish a product market. Dr. Wood failed to determine if the product was just the motors or boats and motors, or if the boats and motors were sold as part of a package. Dr. Wood also failed to take into account that the product market could go beyond the scope of Mercury engines. It is clear that Dr. Wood failed to consider the distinction between being a full-line or package dealer. The evidence presented in this case established that Mercury had other competitors in the boat engine market, but Dr. Wood's focus was only on Mercury engines. Dr. Wood's failure to conduct the proper legal and factual analyses and his decision to define the product narrowly contributed to the plaintiffs' failure to adequately define the product market under settled jurisprudence.

65. This statement by the Court affirmed the reasoning of the District Court in *Bailey v. Allgas, Inc.*, 148 F.Supp.2d 1222 (N.D.Ala. 2000) (Blackburn, J.) that (a) an essential element of any Robinson–Patman claim is the definition of a relevant geographic market and (b) defining such a market may only be accomplished with expert testimony. *Id.* at 1242.

66. *Bailey, supra* at 1246–49. This is the Eleventh Circuit *Bailey* opinion.

67. *Id.* at 1247.

68. According to the Court, such factors include "price data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *Id.* at 1248.

Although the jurisprudence requires adequate expert testimony to define the geographic market and product, the Court finds in the alternative that, even if factual evidence could establish the geographic and product markets, the evidence produced in this case failed to prove these required factors.

Plaintiffs argue the market was obvious because LA Boating was only five to six miles away from the Baton Rouge Travis dealership. Plaintiffs also argue that Mercury representatives admitted in testimony that LA Boating and Travis were in the same geographic market. The Court finds these arguments are without merit. In the deposition and trial testimony presented, there were discrepancies regarding the size of the geographic market that ranged from 25 to 100 miles. Such discrepancies forces the Court to conclude that the relevant geographic market in this case is not as obvious as the plaintiffs contend. The Court acknowledges that the distance between LA Boating and the Baton Rouge Travis dealership would have fallen within any of these ranges. However, this fact is meaningless because the factual evidence offered in this case fails to establish the remaining factors required by the jurisprudence to prove a geographic market.

The testimony and evidence offered in this case never distinguished if the product in this case was limited to the product offered by full-line dealers, or both full-line and package dealers. Further, the facts fail to prove whether the market was limited to Mercury products alone, or if it also extended to Mercury competitors such as Yamaha or OMC.

Therefore, the Court finds that the expert testimony and the factual evidence in this case fails to prove a product or product market as required by the jurisprudence.

### 3. The Meeting Competition Defense

The defendant also asserts as an affirmative defense the meeting competition defense.

The meeting competition defense to a Robinson–Patman claim is set forth in 15 U.S.C. § 13(b)as follows:

> Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be·upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

This section expressly establishes certain prerequisites for the successful assertion of the meeting competition defense. The seller-defendant has the burden of proving four requirements in order to establish his defense: (1) to [rebut] the prima facie case thus made by showing that his lower price was made; (2) in good faith; (3) to meet an equally low price; and (4) of a competitor.[69]

The meeting competition defense is an absolute defense. "The seller has the burden of bringing himself within the exculpating provision of § 2(b), which has been interpreted to afford an absolute defense to a charge of violating § 2(a), not-

---

69. EARL W. KINTNER & JOSEPH P. BAUER, FEDERAL ANTITRUST LAW, § 24.5 (1983).

withstanding the existence of the statutorily prohibited anticompetitive effect." [70]

 The seller also has the burden of proving the meeting competition defense. "Under [section 13(b)], the seller charged with [a violation] has the burden of rebutting a prima facie case of discrimination in price or services or facilities by demonstrating that its lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor. Courts have held . that, to meet its burden, a defendant who knowingly discriminated in price or services or facilities furnished to a customer. must demonstrate the existence of facts that would lead a reasonable. and prudent person to believe that granting the lower price or service or facility would meet a competitor's equally low price." [71]

The United States Supreme Court set forth defendant's requisite burden in proving the meeting competition defense in *Falls City Industries v. Vanco Beverage, Inc.*[72] Here, the Court reiterated its meeting competition defense standard by stating, "[w]hen proved, the meeting-competition defense of § 2(b) exonerates a seller from Robinson–Patman Act liability." [73] The Court reaffirmed the standard discussed above and held that the meeting-competition defense "at least requires the seller, who has knowingly discriminated in

price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." [74]

Further, the Court requires a seller to show that under the circumstances, it was reasonable to believe that the quoted price or a lower one was available to the favored purchaser or purchasers from the seller's competitors.[75]

*Falls City* addresses what facts are required to demonstrate the reasonableness requirement in the meeting competition defense: "In most situations, a showing of facts giving rise to a reasonable belief that equally low prices were available to the favored purchaser from a competitor will be sufficient to establish that the seller's lower price was offered in good faith to meet that price. In others, however, despite the availability from other sellers of a low price, it may be apparent that the defendant's low offer was not a good faith response." [76]

 *Falls City* also discusses the requirement of good faith on the part of the defendant: "At the heart of Section 2(b) is the concept of 'good faith.' This is a flexible and pragmatic, not a technical or doctrinaire, concept. The standard of good faith is simply the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity." [77] Whether this standard is met depends upon "the facts and

**70.** *Federal Trade Commission v. Sun Oil Company,* 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963) *citing. Standard Oil Company v. Federal Trade Commission,* 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951).

**71.** Amy P. Bunk, Annotation, *Meeting Competition Defense Under § 2(b) of Clayton Act, as Amended by Robinson–Patman Act (15 U.S.C.A. § 13(b)),* 164 A.L.R. Fed. 633 (2000).

**72.** 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983).

**73.** *Id.* at 438, 103 S.Ct. at 1290.

**74.** *Id.* quoting *United States v. United States Gypsum Co.,* 438 U.S. 422, 451, 98 S.Ct. 2864, 2880, 57 L.Ed.2d 854 (1978), *quoting FTC v. A.E. Staley Mfg. Co.,* 324 U.S. 746, 759–760, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945).

**75.** *Id.*

**76.** *Id.* at 439, 103 S.Ct. at 1291.

**77.** *Falls City Industries, supra* at 441, 103 S.Ct. at 1292 *citing In the Matter of Continental Baking Co.,* 63 F.T.C.2071, 2163 (1963).

circumstances of the particular case, not abstract theories or remote conjectures." [78] The strict requirement of good faith is illustrated throughout federal jurisprudence and secondary sources:

> The only question in any meeting competition defense is whether the seller has acted in good faith in response to a competitive encroachment. Where a seller has good reasons to believe that a competitor is charging lower prices throughout a particular region, it must be allowed to respond accordingly. While 'good faith' is not defined by the Act, the Federal Trade Commission has developed guidelines which now govern the good faith inquiry. Despite these definitions, the good faith element of the meeting competition defense has proved difficult to apply. Thus far, no pattern has emerged for determining whether a given conduct will satisfy the section 2(b) good faith requirement. At best, some broad guidelines may be constructed from past decisions. The question of whether a given pricing response is valid remains a factual determination based on the reasonableness of the conduct. The same is true for area-wide pricing.

Where there is reasonable proof from past conduct that a competitor is systematically going after a seller's market, the seller should be free to defend its market by meeting the anticipated competition. Because good faith is a flexible and pragmatic concept, a case-by case approach is almost inevitable. [79]

■ Good faith, rather than absolute certainty, is the key requirement. Thus, as long as the seller acts in good faith, it may even inadvertently undercut the competitor's price without forfeiting this defense. [80]

■ The good faith [81] aspect of the defense can be summarized in the following way: "In general, the basic requirement of the Section 2(b) good faith defense is that the seller's conduct must be a reasonable response to the price discrimination of a competitor; if the seller acts reasonably, good faith will likely be found."

If, however, the seller's actions are inappropriate, unnecessary, or unreasonable with respect to the threat posed by its competitor, the seller is not in good faith and will not be allowed to assert the meeting competition defense. [82]

---

78. *Id. citing United States v. United States Gypsum Co., supra* at 454, 98 S.Ct. at 2882. Note that Kintner and Bauer agree that the basic standard of the meeting competition defense is reasonable and prudent conduct. "Good faith for the purposes of the meeting competition defense is conduct based on 'the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor' or 'the standard of the prudent businessman responding fairly to what he reasonably believes is a situation of competitive necessity.' " EARL W. KINTNER & JOSEPH P. BAUER, FEDERAL ANTITRUST LAW, § 24.8 (1983).

79. Nwaneri, Angela. *The Good Faith Meeting Competition Defense to a Section 2(a) Violation of the Robinson–Patman Act: Area–Wide Pricing as a Valid Response to Competition,* 14 Wm. Mitchell L.Rev. 859 (Fall 1998).

80. HOLMES, WILLIAM C., ANTITRUST LAW HANDBOOK § 4.4 (2004) *citing Falls City Industries v. Vanco Beverage, Inc.,* 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983).

81. The Fifth Circuit case *Jones v. Borden Co.,* 430 F.2d 568 (5th Cir.1970) *is an example of* where good faith was found. The Fifth Circuit noted that although "[s]ummary judgment judgments in antitrust cases often are inadvisable," it was proper because the plaintiff failed to introduce the evidence to question or contradict the defendant's asserted good faith defense. *Id.* at note 84, *citing Jones, supra* at 569, 574.

82. *Id.* at 390. *See also McWhirter v. Monroe Calculating Machine Co.,* 76 F.Supp. 456 (W.D.Mo.1948)(Duncan, J.) as an example of conduct which led to the denial of the defense.

 ▪There are two other facts concerning the meet the competition defense that are relevant in this case. First, there is a "meet and not beat" requirement which provides that: "...a seller's response must be defensive, in the sense that the lower price must be calculated and offered in good faith to 'meet not beat' the competitor's low price." [83] Second, the Supreme Court found this defense applies to both retaining old customers and gaining new ones when it stated: "Section 2(b)...does not distinguish [84] between one who meets a competitor's lower price to retain an old customer and one who meets a competitor's lower price in an attempt to gain new customers." [85]

 The Court finds that, under the testimony and other evidence presented in this case, Mercury has proved the required elements of the meeting competition defense by more than a preponderance of the evidence. The evidence presented shows that it was reasonable for Mercury to believe that the discounts it gave to Travis were necessary to meet its competitor, OMC. In addition, the evidence presented shows that Mercury acted in good faith when it negotiated the discounts available to Travis. Mercury's intent at the time was not to drive Water Craft or any of its other dealers into debt and out of business. To the contrary, the testimony shows that Mercury benefitted when its dealers were able to compete with its competition. Mercury wanted to provide Travis with the same discounts it was receiving from OMC so that Mercury could adequately compete with OMC. The evidence also reveals that Mercury was losing its dealers to OMC, a fact that caused it to try to keep the dealers it had as well as allowing its dealers to compete with OMC.

The testimony and evidence also reveal that Mercury was reasonable in believing that it had to provide Travis with these specific discounts to compete with OMC. Even Glascock testified that it was well known within the marine industry that Travis was receiving substantial discounts from OMC. Further, the Mercury employees who testified or were deposed stated that the caliber of the discount that Travis was receiving from OMC was common, though speculative, knowledge in the marine industry. Also, the Court cannot overlook the fact that former OMC employees went to work for Mercury, and it is very possible and indeed probable that substantial information regarding the agreement Travis had with OMC was made known to Mercury. Finally, the low prices that Travis was able to provide to its consumers as an OMC dealer should have and indeed did support Mercury's reasonable and supported belief that it had to provide Travis with the discount that it did in order to secure it as a dealer and to compete with OMC.

The evidence presented in this case also shows that Mercury acted in good faith when it negotiated its discounts with Travis. The dealership scheme existing between Mercury and its dealers clearly shows that it was not in Mercury's best interest to drive its own dealers out of business. In reaching this conclusion on the meeting competition defense, the Court does not find and indeed cannot conclude that Mercury always had the best interest of its dealers at heart when negotiating with Travis. However, under the

---

**83.** *Falls City Industries, supra* at 1294, referencing *United States v. United States Gypsum Co., supra* at 454, 98n S.Ct. at 2882.

**84.** The Court stated that such a distinction would be inconsistent with the section's language and logic.

**85.** *Id.* (Citations omitted.)

evidence presented, the Court finds that Mercury had no intent to drive LA Boating out of business by signing Travis as a dealer. Instead, the evidence showed that Travis was dealing with OMC both before and during the time that it was negotiating with Mercury. Travis was putting OMC engines instead of Mercury engines on its boats. At the same time, Travis was rapidly expanding its presence in the marine industry, and this expansion was occurring with OMC engines. Consequently, Mercury was losing its market share and was forced to take action. Thus, Mercury had to sign Travis in order to compete with OMC. These facts illustrate that Mercury was acting reasonably and in good faith in negotiating a discounts with Travis. Thus, Mercury has proven the meeting competition defense by a preponderance of the evidence. Therefore, plaintiffs' federal antitrust claims would be barred even had plaintiffs been able to prove the elements required to support an antitrust claim, which it clearly failed to do under the facts of this case.

## B. State Law Claims

The Court now turns to a discussion of the plaintiffs' state law claims based on breach of contract, detrimental reliance, fraud, and misrepresentation. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1332. Under the *Erie* doctrine,[86] the Court must apply Louisiana substantive law in reaching its decision in this case.

### 1. Breach of Contract

As noted earlier, plaintiffs have asserted a breach of contract claim under Louisiana law. This claim is governed by provisions of the Louisiana Civil Code and applicable Louisiana jurisprudence.

A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished.[87] A contract has the effect of law between the parties, and courts are bound to give legal effect to the parties' agreements.[88] A contract may be in writing or made orally as long as the law does not require specific form requirements to be met. If the agreement has been reduced to writing, and the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.[89] "[This] rule . . . does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties . . ."[90] In fact, courts generally find that the meaning and intent of the parties to a written instrument should be determined within the four corners of the document. Its terms normally cannot be explained or contradicted by extrinsic evidence.[91]

86. See *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

87. La. Civ.Code art.1906.

88. *Rivercity v. American Can Co.,* 600 F.Supp. 908, 916 (E.D.La.1984)(Arceneaux, J.), *aff'd,* 753 F.2d 1300 (5th Cir.1985).

89. La. Civ.Code art.2046.

90. *Badalamenti v. Jefferson Guar. Bank,* 99–1371 (La.App. 5 Cir. 4/25/00), 759 So.2d 274, 281.

91. See *Omnitech Intern., Inc. v. Clorox Co.,* 11 F.3d 1316, 1330 (5th Cir.1994), *cert. denied,* 513 U.S. 815, 115 S.Ct. 71, 130 L.Ed.2d 26 (1994); *Perfection Metal v. Independent Supply,* 97–800 (La.App. 5 Cir.1998), 707 So.2d 86, 89 and *Barnco Intern., Inc. v. Arkla, Inc.,* 28,157 (La.App. 2 Cir. 11/15/96), 684 So.2d 986, 991, *writs denied,* 97–0019, 97–0058 (La.2/7/97), 688 So.2d 511.

The determination of whether a contract is clear or ambiguous is a question of law.[92] The Fifth Circuit, applying Louisiana law, explained this distinction in *Texas Eastern Transmission Corp. v. Amerada Hess Corp.*[93] According to the Court, a contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight. However, a contract provision is considered ambiguous when it is uncertain what the parties' intentions were and its provisions are susceptible to more than one reasonable meaning under the circumstances and applicable rules of construction.[94]

Although the agreement between the plaintiffs and Mercury was reduced to writing, the plaintiffs base their breach of contract and detrimental reliance claims on oral misrepresentations and promises allegedly made by Mercury representatives prior to and after the written Sales and Service Agreements were executed. Mercury has not claimed that the alleged oral agreements made between it and the plaintiffs were required to be in writing under Louisiana law. However, in order to sustain a cause of action for breach of an oral agreement for value in excess of $500, a party must prove its existence by at least one witness and corroborating circumstances.[95] It is clear that the plaintiff claiming that an oral agreement exists may himself meet the requirement that there be at least "one credible witness."[96] Because there is a written contract in this case, the Court must address whether the facts of this case permit it to use parol evidence and whether the integration clause in the contract at issue precludes the Court from going outside the four corners of the contract to even consider whether there was a valid oral agreement between the parties.

The parties dispute whether or not parol evidence should be admitted to allow the plaintiffs to present evidence to establish the various oral promises allegedly made by Mercury. Article 1848 of the Louisiana Civil Code, which sets forth Louisiana's rule on admitting parol evidence in contract disputes, provides:

> Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.[97]

Louisiana courts consistently hold that an oral agreement may not be admitted to vary the terms of a written contract except under the circumstances enumerated by article 1848.[98] Thus, because oral agreements do not fall within the ambit of article 1848, "contemporaneous oral agreements or understandings between the parties which are not made part of the written contract" do not qualify as an exception to the parol evidence rule.[99] Similarly, parol evidence is not admissible to

---

**92.** *Shaw Constructors, Inc. v. ICF Kaiser Engineers, Inc.*, 192 F.Supp.2d 545, 550 (M.D.La.2001)(Riedlinger, Mag. J.).

**93.** 145 F.3d 737 (5th Cir.1998).

**94.** *Id.* at 741.

**95.** La. Civ.Code art. 1846. *See also Conkling v. Turner*, 18 F.3d 1285, 1301 (5th Cir.1994).

**96.** *Conkling, supra* at 1301 *citing Samuels v. Firestone Tire & Rubber Co.*, 342 So.2d 661, 662 (La.1977).

**97.** La. Civ.Code art. 1848. *See also Grabert v. Greco*, 96–0415 (La.App. 4 Cir. 12/27/96), 686 So.2d 1032, 1034, *writ denied*, 97–0260 (La.3/14/97), 689 So.2d 1388.

**98.** *Conkling, supra* at 1304 *citing* various Louisiana cases.

**99.** *Crochet v. Pierre*, 94–543 (La.App. 5 Cir.

show prior oral agreements that contradict the terms of a written contract.[100]

██ There are some judicially carved exceptions to the above rule that permit courts to admit parol evidence when a written contract is at issue. Under Louisiana law, parol evidence is admissible "to show fraud, mistake, illegality, want or failure of consideration, [and] to explain an ambiguity when such explanation is not inconsistent with the written terms..."[101] One of the most discussed exceptions to the parol evidence rule is the principle that parol evidence is admissible to show that a writing is only part of an oral contract.[102] This exception was explained in *Stokes v. Georgia–Pacific Corp.*,[103] wherein the plaintiff sued Georgia–Pacific under the theory of detrimental reliance. Plaintiff alleged that Georgia–Pacific had made an oral contract to purchase a certain amount of wood chips a week in exchange for the plaintiff's investing in a large woodchipper. These purchases were memorialized by 30–day written contracts. These contracts set forth the volume of chips to be delivered, the price per ton, and the time period involved. The court found that parol evidence of additional oral agreements allegedly made between the plaintiff and

Georgia–Pacific was admissible because the 30–day written contracts did not encompass the complete and entire agreement between the parties.[104]

The Louisiana Fourth Circuit Court of Appeal summarized this exception that parol evidence is admissible to show that a writing is only part of an oral contract in *Kirsch v. Pier Orleans, Inc.:*[105]

The parol evidence rule does not make [evidence of prior negotiations] irrelevant; the new agreement in writing makes [evidence of prior negotiations] irrelevant, but only if the written agreement is a complete and accurate statement of all of the terms agreed upon by the parties.[106]

In *Kirsch,* the court admitted evidence of prior negotiations into the record to show that the written agreement at issue was not the complete agreement made between the parties. The court reasoned that parol evidence is admissible to show that the parties did not intend to substitute one written contract for all of their prior negotiations and agreements.[107]

Parol evidence may also be admitted to show a subsequent, new and independent agreement that was intended to modify the original contract.[108]

11/29/94), 646 So.2d 1222, 1225, *writ denied,* 95–0004 (La.2/9/95), 649 So.2d 429. *See also Perfection Metal, supra* at 89–90.

100. *Miller v. Irshaid Inc.*, 96–1473 (La.App. 3 Cir. 4/2/97), 692 So.2d 710, 712 and *Barnco, supra* at 991.

101. *Scafidi v. Johnson*, 420 So.2d 1113, 1115 (La.1982). *See also Land and Offshore Co. v. Martin*, 469 So.2d 1177, 1181 (La.App. 3 Cir. 1985) for fraud, misrepresentation, or error.

102. *See Stokes v. Georgia–Pacific Corp.*, 894 F.2d 764, 768 (5th Cir.1990). *See also Scafidi, supra* at 1115.

103. *Stokes, supra.*

104. These contracts only regulated the volume and movement of the wood chips. Thus,

parol evidence of other agreements made between the parties was admissible. *Id.* at 768.

105. 362 So.2d 1182 (La.App. 4 Cir.1978).

106. *Id.* at 1184.

107. *Id.* at 1185.

108. *Anzalone v. Gregory*, 334 So.2d 504, 506 (La.App. 1 Cir.1976). In *Anzalone v. Gregory*, the general and electrical contractors filed suit under the Private Works Act against the homeowner. The original plans called for an elaborate electrical system. After further negotiations, the parties agreed on a basic electrical system. The court rejected the homeowner's argument that parol evidence of this subsequent agreement was inadmissible. The court held that parol evidence is admissible to

■ Under the law applicable to the facts of this case, the Court finds that parol evidence may be admitted in this case to prove the following issues: (1) fraud, misrepresentation, or error in their negotiations with Mercury; (2) a subsequent agreement between the parties that was independent of the disputed written agreement or intended to modify the original contract; (3) the written agreement only represented part of the entire agreement between the parties; and (4) a subsequent and valid oral agreement was entered into between the parties.

■ The parties also argue over whether the integration clause contained in the disputed Sales and Service Agreements precludes the use of parol evidence. The presence of a merger clause in a contract does not preclude the use of parol evidence *per se.* Instead, the court must look at the facts of the individual case to determine if the merger clause "compel[s] a conclusion that [it] correctly reflected the parties' intentions and should thus be enforced as written." [109] The Fifth Circuit, applying Louisiana law, has held that a merger clause precludes evidence of agreements made outside of the written contract. Thus, in *Omnitech Intern., Inc. v. Clorox Co.,*[110] the Fifth Circuit precluded the use of parol evidence to prove alleged oral representations and subsequent oral modifications because the disputed contract at issue contained a merger clause that only allowed it to be modified in writing.[111]

■ In contrast to the *Omnitech* case, the Fifth Circuit did hold in *Stokes v. Georgia–Pacific Corp.* that "[p]arol evidence is admissible to prove a non-integrated side agreement." [112] In *Stokes,* the court found that parol evidence is admissible, even when a written contract contains an integration clause, if the facts showed the parties did not intend to substitute one written contract for all of their prior negotiations and agreements and the written agreement was not assented to as a complete integration.[113]

The integration clause contained in the disputed Sales and Service Agreement entered into between Water Craft and Mercury provided that the agreement could only be "amended or modified... by written instrument." [114] Though parol evidence could be used to show this agreement did not represent the full agreement

---

show a subsequent, new and independent agreement.

**109.** *Omnitech, supra* at 1328.

**110.** *Omnitech, supra.*

**111.** The Court did not admit parol evidence here because the merger clause had defined the agreed-upon means by which the parties' obligations could be modified. *Id.* at 1328. Recently, the Fifth Circuit applied *Omnitech* in the context of a claim for detrimental reliance in *Drs. Bethea v. St. Paul Guardian Ins. Co.,* 376 F.3d 399 (5th Cir.2004). This decision did not deal directly with parol evidence or a breach of contract claim; however, it did use an integration clause to preclude claims for detrimental reliance and unjust enrichment. *Drs. Bethea* illustrates the importance that the Fifth Circuit places on only looking at a contract dispute in the context of the four corners of the document whenever the disputed document is an unambiguous, fully-integrated agreement. *See also Talbert–Siebert Ent., Inc. v. Shell Oil Company,* 1992 WL 119916, *2 (M.D.La.1992)(Parker, J.), *aff'd,* 995 F.2d 224 (5th Cir.1993) (Refused to allow parol evidence in when "the integration clause [forbade] consideration of any oral agreement either before or after execution of [the written agreement].").

**112.** *Stokes, supra* at 768.

**113.** The Fifth Circuit required the integration clause to be "complete written integration" and an "accurate statement of all the terms agreed upon by the parties". *Id.*

**114.** Rec. Doc. No. 326 at 9.

between plaintiffs and Mercury Marine, this integration clause clearly shows that the parties intended this written agreement to be the complete understanding between them and could only be amended or modified in writing. The *Omnitech* and *Talbert–Siebert* cases, as well as the Fifth Circuit's recent decision in *Drs. Bethea*, all support a decision not to consider parol evidence in this case, especially in light of the integration clause's specific instruction on how amendments and modifications were to be made to this agreement. However, *Stokes* supports this Court's decision to allow parol evidence to be admitted to establish that a non-integrated side agreement existed between the plaintiffs and Mercury.

◼ Considering the above legal principles, the Court cannot consider the parol evidence submitted by the plaintiff which related to the preliminary discussions between Glascock, Martrain and Rohrbach. The integration clause contained in the Sales and Service Agreements clearly shows that the parties intended for this document to supercede all prior agreements between Water Craft and Mercury Marine. The Court also finds that it cannot consider any evidence of the alleged promises made by Rohrbach prior to the execution of the Sales and Service Agreements because the integration clause effectively superceded any discussions that Glascock and Martrain had with Rohrbach. In short, the Court finds that the agreement entered into between Water Craft and Mercury was a comprehensive document meant to cover virtually every facet of the relationship between the parties.

◼ The Court must now determine whether the subsequent representations made to Glascock and Martrain by Randolph, Koenen, Schmiedel, and other Mercury representatives after approximately March or April 1997, can be admitted into evidence. Specifically, the Court finds

that discussions between Glascock and Martrain with Mercury representatives regarding certain discounts and incentives that they would receive as Mercury dealers are not admissible because the Sales and Service Agreements determined the discounts and incentives that Glascock and Martrain were to receive. The integration clause specifically set forth a method to subsequently modify these discounts and incentives. No evidence has been presented to show that this required procedure was followed to revise that section of the written agreements which pertained to discounts and incentives.

◼ However, the Court does find that the representations made to Glascock and Martrain regarding whether or not Travis would be made a Mercury dealer are admissible under the parol evidence rule. The Court finds that the representations made by Randolph to Glascock and Martrain at the Hilton Hotel bar and Juban's Restaurant and the representations made by Schmiedel throughout his dealings with Water Craft were nonintegrated side agreements which were not included within the scope of the Sales and Service Agreements. These agreements were nonintegrated because the Sales and Service Agreements did not contain or represent the complete integration of subsequent representations made to Glascock and Martrain regarding Travis. Thus, the Court finds that the Sales and Service Agreements were not a complete and accurate statement of all the terms agreed upon by the parties. The representations and agreement by Mercury representatives to not make Travis a Mercury dealer, unlike the Rohrbach negotiations, was an agreement not contemplated under nor included within the language of the Sales and Service Agreements. These important facts distinguish these later representations from Rohrbach's representations which were integrated into the 1997 Sales

and Service Agreement. Specific questions were asked by plaintiffs. In response thereto, specific promises were made by Mercury in response to these questions. Mercury's specific responses and promises that it was not going to make Travis a Mercury dealer constitute separate contracts. Under the unique facts of this case, the Court finds that plaintiffs have a right to introduce parol evidence to prove that these nonintegrated but very important and pertinent promises formed contracts separate and apart from the Sales and Service Agreements.

■ The Court further finds that the conversations between Glascock and Martrain and Koenen regarding extra financing can also be admitted as parol evidence under the facts of this case. Although it can be argued that details regarding financing may be covered by the Sales and Service Agreements, the Court concludes that these specific conversations and promises were made at a very important time and circumstance and constitute nonintegrated and separate agreements under the facts of this case. Specifically, the facts indicate that the circumstances were substantially different at this crucial time when Water Craft was engaged in very serious negotiations with Mercury regarding whether it should close and whether it would get financing to remain open. The evidence reveals that these conversations with and representations by Mercury did occur. Glascock and Martrain were ready to close LA Boating. However, the testimony indicates that something important occurred which made them change their decision to close LA Boating. The Court finds the representations by Koenen that extra financing would be available from Mercury to keep the LA Boating store afloat were the catalyst which caused Glascock and Martrain to decide not to close LA Boating at that time. At this point, the cause of the agreement was to keep the entire entity of Water Craft running despite the economic troubles facing LA Boating. Another cause of the agreement at this critical stage of the case was to keep LA Boating running so that it would eventually become the powerhouse Mercury dealer in the Baton Rouge market which Mercury desired. These causes are entirely different from the cause that existed for Glascock and Martrain when they entered the Sales and Service Agreements. Thus, the Court will permit the introduction of parol evidence of the financing negotiations between Glascock and Martrain and Koenen as a nonintegrated side agreement.

■ Having determined what parol evidence is admissible, the Court now turns to a discussion of whether the plaintiffs have proven their breach of contract claims by a preponderance of the evidence. The Court finds that Mercury did not breach any contractual obligation it had to the plaintiffs under the Sales and Service Agreements. This preliminary finding is an easy decision for the Court to make because the plaintiffs did not introduce any evidence to prove that the obligations required under these agreements were not fulfilled or breached. Instead, the plaintiffs chose to introduce evidence of promises made by Mercury representatives to give them the best discounts, not to make Travis a Mercury dealer, and promises of extra financing into evidence. Since all of this evidence has either been declared inadmissible under the parol evidence rule or declared to be a nonintegrated side agreement, separate from the Sales and Service Agreements, the Court finds that the Sales and Service Agreements entered into between Mercury and Water Craft were not violated.

The Court also finds that plaintiffs' claim that Mercury breached an oral contract with Water Craft by making Travis a Mercury dealer is without merit. The Court concludes that no such contract ex-

isted under the facts presented in this case. The Court does find that representations were made to Glascock and Martrain in early 1997 by Mercury representatives that Travis would not be made a Mercury dealer. This important finding and determination is very relevant to plaintiffs' detrimental reliance claim and will be discussed in great detail later in this opinion when the Court considers the detrimental reliance claim. While this finding is important to the detrimental reliance claim, it does not prove that a valid contract existed between the plaintiffs and Mercury that Travis would not be made a Mercury dealer. The evidence and testimony presented fail to show that there was ever a meeting of the minds between the parties that Mercury was obligated not to make Travis a dealer. Instead, Randolph's assertions that Travis would not become a Mercury dealer were misrepresentations that prompted Glascock and Martrain to continue operating LA Boating in the Baton Rouge market. While these misrepresentations cannot be sanctioned by the Court, they did not constitute a complete and valid contract between the parties that would support a claim for breach of contract.

Similarly, the representations made by Schmiedel to Glascock and Martrain that Travis would not become a Mercury dealer were largely based on misinformation. The Court finds that Schmiedel was initially just reporting what he had heard from his Mercury superiors—that Travis was not going to be made a Mercury dealer. However, once Schmiedel began giving Glascock and Martrain "lip service" at the direction of his Mercury superiors, this misinformation became a misrepresentation. While Schmiedel's misrepresentations are important on the detrimental reliance claim, they do not support plaintiffs' breach of contract claim.

The Court also finds the promises of Koenen and other Mercury representatives to keep a sinking LA Boating afloat did not amount to a complete and valid contract that could be breached between the plaintiffs and Mercury. These representations of extra financing are relevant to the detrimental reliance claim and will be discussed in more detail later in this opinion. Though Martrain may have relied on Koenen's optimism and promises of financing to the plaintiffs' detriment, a contract was never formed.

Because the Court finds that Mercury did not breach the Sales and Service Agreements and that no valid oral contract was ever formed between Mercury and the plaintiffs for additional interest free financing or to not make Travis a Mercury dealer, the Court finds that the plaintiffs have failed to satisfy their required burden to prove their breach of contract claims by a preponderance of the evidence. Therefore, the Court dismisses plaintiffs' state law contract claims.

## 2. Detrimental Reliance

The plaintiffs have also filed a claim based on detrimental reliance. Plaintiffs argue that they relied to their detriment on various misrepresentations and promises made by Mercury and their representatives during the course of their relationship with Mercury in opening and operating a Baton Rouge dealership. Thus, plaintiffs contend they are entitled to damages under a theory of detrimental reliance.

Article 1967 of the Louisiana Civil Code provides that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." [115] This article of the

---

115. La. Civ.Code art.1967.

Louisiana Civil Code sets forth Louisiana's version of the doctrine known as detrimental reliance, and is "designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence."[116] Some Louisiana courts have characterized detrimental reliance as being a disfavored doctrine and have held that it should be applied sparingly because it bars the normal assertion of rights otherwise present.[117] While some courts may be reluctant to apply the doctrine, it is clear that the Louisiana jurisprudence has approved its use in appropriate cases.

■ Louisiana law requires a plaintiff to prove the following to recover for a claim of detrimental reliance: (1) a representation was made; (2) there was justifiable reliance thereon; and (3) there was a change of position to one's detriment because of the reliance.[118] The plaintiff bears the burden of proving each of these elements by a preponderance of the evidence.[119]

■ In determining if the party claiming detrimental reliance was justified in his reliance thereon, the courts generally look to whether the reliance was reasonable under the circumstances. Under Louisiana law, reasonableness is determined by examining factual circumstances like the commercial sophistication of the party claiming detrimental reliance and the negotiations and/or documents the party relied on.[120] In some cases, courts have found that the presence of an integration clause in a contract is a factual circumstance that makes one's reliance unreasonable. For example, the Fifth Circuit, applying Louisiana law, held in *Omnitech* that it is unreasonable as a matter of law for a party to rely on representations or promises made outside of a written agreement if the agreement has been reduced to writing, contains an integration clause, and such representations or promises were made outside of the scope of the fully-integrated written agreement.[121] Recently, the Fifth Circuit, relying on *Omnitech*, found that a plaintiff's reliance on promises made outside of an unambiguous, fully-integrated agreement was unreasonable as a matter of law in *Drs. Bethea v. St. Paul Guardian Ins. Co.*[122] Similarly, in *Talbert–Siebert Ent., Inc. v. Shell Oil Company*,[123] Judge John V. Parker found that an integration clause barred a claim for detrimental reliance since the reliance was on alleged representations not memorialized in the written contract.[124] It is noteworthy that in each

116. *Andrus v. Andrus*, 93–856 (La.App. 3 Cir. 3/2/94), 634 So.2d 1254, 1258.

117. *Holt v. Bethany Land Co.*, 36,888 (La.App. 2 Cir. 4/9/03), 843 So.2d 606, 613 *citing Miller v. Miller*, 35,934 (La.App. 2 Cir. 5/8/02), 817 So.2d 1166, *writ denied*, 02–1890 (La.10/25/02), 827 So.2d 1154.

118. *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1069 (5th Cir.1993), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2710, 129 L.Ed.2d 836 (1994); *Barnett v. Bd. of Trustees for State Colleges & Univs.*, 2000–1041 (La.App. 1 Cir. 6/22/01), 809 So.2d 184, 189; *Babkow v. Morris Bart, P.L.C.*, 98–0256 (La.App. 4 Cir. 12/16/98), 726 So.2d 423, 427; *Orr v. Bancroft Bag, Inc.*, 29,046 (La.App. 2 Cir. 1/22/97), 687 So.2d 1068, 1070; and *Law v.*

*City of Eunice*, 94–1312 (La.App. 3 Cir. 4/5/95), 653 So.2d 149, 150.

119. *Babkow, supra* at 427 *citing Law, supra* at 150–51.

120. Compare *Babkow, supra* at 427–28 *with Academy Mortg. Co., LLP v. Barker, Boudreaux, Lamey & Foley*, 96–0053 (La.App. 4 Cir. 4/24/96), 673 So.2d 1209, 1211–12.

121. *Omnitech, supra* at 1330.

122. 376 F.3d 399 (5th Cir.2004).

123. *Talbert–Siebert, supra*.

124. *Id.* at 406–07.

of these cases the courts required complete and full integration of all of the agreements made between the parties into the disputed documents for the integration clause to effectively preclude a claim for detrimental reliance. Complete integration is a factual issue and is not an automatic finding the courts generally make.[125]

In order for the plaintiffs to prove that they changed their position to their detriment in reliance on a representation from Mercury, the Louisiana courts require proof that the plaintiffs suffered damages not adequately compensated by the defendant.[126] Essentially, this means that damages must be proven in order for a claim of detrimental reliance to be sustained.[127]

Thus, to sustain their claim for detrimental reliance against Mercury, the plaintiffs must prove by a preponderance of the evidence that (1) Mercury made oral representations that it would not contract with other dealers, specifically Travis, and would supply plaintiffs with financing; (2) the plaintiffs justifiably relied on these representations; and (3) the plaintiffs' positions changed to their detriment because of this reliance. Further, the plaintiffs must prove that their reliance on these alleged misrepresentations made by Mercury was reasonable under the facts and circumstances of this case.

■ The Court finds that the plaintiffs have proven their claim for detrimental reliance by a preponderance of the evidence. As a preliminary matter, the Court finds that the presence of an integration clause in the Sales and Service Agree-

ments entered into between Water Craft and Mercury does not make Glascock and Martrain's reliance on Mercury's representations automatically unreasonable under the unique facts of this case. A per-se rule that an integration clause nullifies any claim for detrimental reliance contradicts the very nature of a claim for detrimental reliance. This is particularly true under the facts of this case where it is clear that plaintiffs asked specific questions about matters of particular importance and representatives of Mercury intentionally gave false and misleading answers to these questions which clearly caused the plaintiffs to take a different course of action to their detriment. The purpose of this remedy is to afford a party relief whenever no contract is found. The existence of a promise and reasonable reliance on that promise to one's detriment are the only requirements needed to sustain a claim for detrimental reliance.[128] Based on the unique facts of this case and the remedies available to plaintiffs, the equitable nature of detrimental reliance should be applied herein and the integration clause in the contract does not automatically make plaintiffs' reliance unreasonable on this claim for detrimental reliance. Further, the Court finds that the *Omnitech, Talbert–Siebert*, and *Drs. Bethea* cases did not fix a per-se unreasonable rule. Rather, the courts in these cases relied on the presence of an integration clause to determine that the parties' reliance was unreasonable under the factual circumstances of those cases. A careful reading of the three opinions reveals that they do not

---

125. *See e.g. Stokes, supra* at 768. The *Stokes* decision and its illustration of how the Fifth Circuit has found the existence of non-integrated, side agreements in certain factual settings is discussed fully in Section II(B)(1) of this opinion, *supra*.

126. *Babkow, supra* at 428 *citing Autin's Cajun Joint Venture v. Kroger Co.*, 93–0320 (La.App.

1 Cir. 2/16/94), 637 So.2d 538, 543, *writ denied*, 94–0674 (La.4/29/94), 638 So.2d 224.

127. *Autin's, supra* at 542–43.

128. *Percy J. Matherne Contractor, Inc. v. Grinnell Fire Protection Systems Co.*, 915 F.Supp. 818, 824 (E.D.La.1995), *aff'd*, 102 F.3d 550 (5th Cir.1996) (Vance, J.).

mandate a court to find that a claim for detrimental reliance is barred in every case where there is an integration clause in a contract.[129] Instead, these decisions only preclude detrimental reliance claims when the disputed contract was a fully integrated document. As noted earlier in this opinion, this Court has found that the Sales and Service Agreements were not fully integrated documents that contained all of the agreements made between plaintiffs and Mercury representatives. This Court's decision to apply the detrimental reliance doctrine is not only appropriate under the facts of this case, but is further supported by the Court's conclusion that there were nonintegrated agreements made by the parties. Thus, the Court finds that plaintiffs' detrimental reliance claim is not barred because there was only an integration clause in some of the agreements which exist in this case.

■ The applicable law set forth above and the facts of this case clearly support a finding that Glascock and Martrain relied to their detriment upon representations made by Randolph, Schmiedel, and other Mercury representatives that Travis would not be made a Mercury dealer. The Court further finds that the promises and statements upon which the plaintiffs relied were made in early 1997 when plaintiffs met with Randolph and Bill Burns at the Hilton Hotel bar, and Juban's Restaurant. At these meetings, Randolph and Burns did specifically promise the plaintiffs that Travis would not be made a Mercury dealer in response to direct questions plaintiffs asked on this important factor. It is also clear that Glascock and Martrain relied on these promises and were reasonable in doing so. Glascock and Martrain consistently testified that they were well aware

of the powerful presence of Travis in the marine industry and what Travis would do in the Baton Rouge area. The Court finds these experienced businessmen would not have invested the amount of money and other resources they did in their Baton Rouge dealership had they known that Travis would be competing with them in selling Mercury engines. To hold otherwise would cause this Court to sanction the inappropriate and misleading statements, actions and inactions of Mercury and its authorized representatives. This Court is not prepared to do so under the facts of this case.

The Court finds the Hilton and Juban meetings to be very important evidence to support the plaintiffs' detrimental reliance, fraud and misrepresentation claims for two reasons. First, these meetings were conducted with Mercury executives. Unlike the Rohrbach negotiations, the plaintiffs were being told in a very specific and direct way that Travis would not be made a Mercury dealer from the "horse's mouth." Second, the evidence shows that both Randolph and Bill Seely caused Glascock and Martrain to be concerned about the possibility of Travis becoming a Mercury dealer. It was well-known that Randolph and Seely had worked for OMC and they had been responsible for bringing Travis to OMC. It was only reasonable and indeed understandable for the plaintiffs to speculate and be concerned that Seely and Randolph would use their prior relationship with Travis to convince Travis to become a Mercury dealer. Thus, when Glascock and Martrain heard from Randolph that Travis would not become a Mercury dealer, Glascock and Martrain gained the confidence to proceed with their Baton Rouge dealership and make the necessary

---

129. *See Drs. Bethea v. St. Paul Guardian Ins. Co.*, 2002 WL 31697714, *5 (E.D.La. Oct 20, 2002) (Duval, J.), *aff'd*, 376 F.3d 399 (5th Cir.2004) ("*Omnitech*, however, does not state that a merger clause will render reliance on extra-contractual promises unreasonable in all cases.").

investments knowing that Travis would not become a Mercury dealer in Baton Rouge. Plaintiffs were justified in relying on these statements and acted appropriately under the facts of this case.

The credibility of the witnesses who testified was taken into consideration by the Court in reaching its findings of fact in this case. The Court has no doubt that Randolph made these promises to Glascock and Martrain in early 1997 considering the manner that Randolph testified at trial and the Court's belief that Randolph was not a credible witness during these proceedings. Randolph's failure to deny that he told the plaintiffs Travis would not be a Mercury dealer is difficult to understand. He did testify that he was "not sure" if Glascock and Martrain had even asked him about Travis. Considering the evidence, the Court simply does not believe that Randolph was "not sure" about this very important fact since the evidence reveals that Glascock and Martrain consistently testified that they had voiced their concerns about Travis being a Mercury dealer from the very beginning of their negotiations with Rohrbach. Whether Travis would become a Mercury dealer, and how Glascock and Martrain would react to such an event was the subject of numerous emails admitted in evidence before the Court. For Randolph to testify that he could not remember the crucial detail of whether Glascock and Martrain ever asked him about Travis supports the Court's decision to discount his credibility.

During his later testimony, Randolph again testified he was "not sure" what he had told Glascock and Martrain about Travis. Because the Court became so concerned with Randolph's carefully crafted testimony and his inability to recall important details about his discussions with Glascock and Martrain, the Court asked Randolph to specifically tell the Court what he had told Glascock and Martrain about Travis:

Q. MR. RANDOLPH, DID YOU TELL THEM AT ANY TIME DURING THAT MEETING THAT MERCURY WAS ALSO PLANNING AND DEVELOPING A STRATEGY TO CONVERT TRAVIS TO A MERCURY DEALER?

A. I AM NOT SURE IF THAT CONVERSATION CAME UP AT THAT PARTICULAR TIME, BUT THAT WAS AN ONGOING CONVERSATION WITHIN MERCURY AND HAD BEEN FOR, AT THIS POINT, TEN YEARS.

Q. I UNDERSTAND THAT, BUT DID YOU TELL THAT TO MR. GLASCOCK AND MR. MARTRAIN?

A. I AM NOT SURE I WOULD HAVE, IT WOULD HAVE BEEN A POINT FOR ME BRINGING THAT UP TO THEM.

Q. MR. RANDOLPH, DO YOU REMEMBER SITTING AT THE HILTON IN THE BAR AND HAVING A DRINK WITH MR. MARTRAIN THE SAME NIGHT Y'ALL WENT TO DINNER AT JUBAN'S RESTAURANT, AND HE EXPRESSED SOME CONCERN TO YOU ABOUT ARE YOU GOING TO BE MAKING TRAVIS A DEALER, BECAUSE I COMPETED AGAINST THEM WHEN THEY WERE AN OMC DEALER? DO YOU REMEMBER HIM ASKING YOU DIRECTLY, ARE Y'ALL GOING TO MAKE THEM A DEALER?

A. THAT MAY HAVE BEEN A CONVERSATION. I DON'T RECALL EXACTLY WHAT WAS SAID THAT NIGHT. I DO RECALL THE EVENING. YES.

Q. AND YOU NOW MAY RECALL THAT HE EVEN ASKED THAT QUESTION TO YOU?

A. IF HE HAD ASKED ME THAT QUESTION, MY RESPONSE AT THAT TIME WOULD HAVE BEEN THAT YOU ARE THE DEALER THAT WE ARE SIGNING FOR MERCURY TODAY.

Q. AND YOU DIDN'T TELL HIM THERE WAS A PLAN IN PLACE TO MAKE TRAVIS A DEALER, DID YOU?

A. I DON'T KNOW THAT IT WOULD HAVE COME UP IN THE CONTEXT OF THE CONVERSATION.

THE COURT: WELL, THAT ISN'T THE QUESTION. THE QUESTION IS DID YOU TELL HIM?

A. I DON'T RECALL.[130]

The above testimony is just one example of the evasive manner in which Randolph testified and supports the Court's decision to question Randolph's credibility and testimony at the trial. Even after the Court questioned Randolph about his representations, he could not recall what he had told Glascock and Martrain about Travis. The Court does not believe this testimony. The testimony presented and the other evidence admitted during the trial clearly shows that Randolph was very instrumental in convincing Travis to become a Mercury dealer. Randolph covered up the possible deal with Travis to the plaintiffs. Because of the false promise and misrepresentations Randolph made to the plaintiffs, the plaintiffs invested a lot of money into their Baton Rouge dealership without being told the true facts by Mercury.

The Court further finds that the plaintiffs' claim for detrimental reliance is also supported by the representations that Schmiedel made to Glascock and Martrain. Because of his dealings with Glascock and Martrain and his knowledge of their business, Schmiedel testified that he thought that the Travis deal was clearly unfair to Glascock and Martrain despite his employment by Mercury. Schmiedel denied the existence of a Travis deal with Mercury to most of his dealers at the direction of Mercury representatives even though he knew a deal between Travis and Mercury was in the making. In fact, Schmiedel testified that Mercury representatives had told him to give "lip service" to Mercury dealers when questioned about the possibility of a deal between Mercury and Travis. Schmiedel's testimony also reflects that he was accused by Mercury representatives of not being a "team player" for questioning the Travis deal and the effect that it would have on other Mercury dealers.

Though Schmiedel was cross examined thoroughly concerning these damaging statements, the Court believes that such statements were made. The Court also finds that the plaintiffs relied on Schmiedel's promises and misrepresentations to their detriment. Glascock and Martrain continued to invest capital into the Baton Rouge dealership based on their reasonable and justified belief that these investments would pay off without the Travis presence in the Baton Rouge market. It is clear that Glascock and Martrain invested in and opened their Baton Rouge dealership because they had relied to their detriment on the misleading promises that Mercury representatives had made to them that Travis would not be a Mercury dealer.

Finally, the Court finds that the representations made to Glascock and Martrain by Koenen around the August 1998 time frame when Glascock and Martrain were considering closure of the Baton Rouge

130. Trial Transcript at 103:12–104:19, *Water Craft Management, L.L.C., et. al. v. Mercury Marine (A Division of Brunswick Corporation)*, *et. al.* (Civ. Action No. 99–1031–B–M1)(M.D.La. August 19, 2003).

dealership, also support the plaintiffs' claim for detrimental reliance. The Court finds that, in August 1998, Glascock went to the bank with every intent of closing the Baton Rouge dealership·because it was in financial trouble.[131] Further, the Court finds that the efforts and statements of Schmiedel and Koenen were instrumental in Glascock and Martrain deciding not to close the Baton Rouge dealership at this time. The testimony about various meetings, telephone conversations, and emails admitted into evidence clearly support the Court's finding. Further, the Court finds that Martrain's version of his discussion with Koenen regarding the need for financing is the most accurate version of what occurred between Koenen and Martrain. The Court believes that Koenen brought up the zero-interest financing proposal in an effort to keep Glascock and Martrain from closing the Baton Rouge dealership. The Court further finds that Koenen's careful testimony to the contrary is somewhat suspect, especially since she testified under the watchful eyes of her Mercury superiors. The Court also finds that the only reason that Glascock and Martrain kept the Baton Rouge dealership open at this time was because of the insistence of Koenen and Schmiedel and the promises of extra financing Koenen made to keep the Baton Rouge dealership open. When Mercury failed to provide this financing, Glascock and Martrain sustained some damages, though the determination of the amount of damages is not before the Court at this time. Thus, the discussions regarding extra financing to keep the Baton Rouge dealership open in August 1998 support the plaintiffs' claim for detrimental reliance.

In conclusion, the Court finds that the plaintiffs have proven their claim for detrimental reliance by a preponderance of the evidence. This conclusion is based upon: (1) the testimony regarding the meetings at the Hilton Hotel bar and Juban's Restaurant; (2) representations made by Schmiedel to the plaintiffs; and, (3) the efforts of Koenen and Schmiedel to convince Glascock and Martrain not to close the Baton Rouge dealership in August 1998. It is also important to note that the Court's decision to find that plaintiffs have proven their detrimental reliance claim was not based on any alleged misrepresentations made by Rohrbach or other acts or statements made before the meetings held at the Hilton Hotel bar and Juban's Restaurant.

Before the Court turns to a discussion of plaintiffs' other claims, the Court believes it is necessary to address one additional argument made by Mercury on the detrimental reliance claim. Mercury has. argued that the plaintiffs' reliance on its alleged promises not to enter into contracts with other dealerships, such as Travis, was unreasonable because such an agreement would have violated state law, and specifically article 1968 of the Louisiana Civil Code and the Louisiana Used Motor Vehicle Dealers and Marine Product Dealers Act.[132] Mercury contends that a contract is null if it is based on an unlawful cause.[133] Louisiana courts have interpreted this principle to mean that contracts with a cause that violates a state statute are null.[134] Mercury says that the

---

131. The Court knows that other factors have also caused the financial losses of LA Boating. The issue of what damages were caused by Mercury will be decided at a later date.

132. La. R.S. 32:771, *et seq.*

133. La. Civ.Code art. 1968 ("The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy.").

134. *Bach Investment Co. v. Philip,* 98–667 (La.App. 5 Cir. 12/16/98), 722 So.2d 1222, 1223 and *Lieber v. Caddo Levee Dist. Bd. of Com'rs,* 27,267 (La.App. 2 Cir. 8/23/95), 660 So.2d 188, 193, *writ denied,* 95–2355 (La.12/8/95), 664 So.2d 427.

1996 version of the Louisiana Used Motor Vehicle Dealers and Marine Product Dealers Act [135] prohibited it from agreeing not to enter into contracts with other dealers to sell Mercury products. Though Mercury has presented several cases saying that a cause that violates a state statute could make a contract null, it has not presented any cases that say that reliance on such assertions is *per se* unreasonable in a claim for detrimental reliance. Mercury's argument also fails to acknowledge the well settled legal principle that a valid contract is not necessary to sustain a claim for detrimental reliance. Because of Mercury's failure to fully develop this argument outside of the context of a breach of contract claim, the Court finds this argument to be without merit on the detrimental reliance claim.

### 3. Fraudulent Misrepresentations

The plaintiffs also contend that the oral misrepresentations and promises made by Mercury were fraudulent under Louisiana law. Although the Court has previously dismissed all tortious misrepresentation claims,[136] it still must decide whether Mercury made fraudulent misrepresentations to the plaintiffs which caused plaintiffs to sustain damages. Louisiana recognizes a cause of action for intentional fraudulent misrepresentation as to present or past facts. A party who is injured by the fraud and deceit of another has a cause of action for damages.[137] The action for fraudulent misrepresentation may be brought either as a breach of contract or tort action. If the cause of action is under contract, the plaintiff's damages are limited to actual pecuniary loss proven by a preponderance of the evidence. If the action lies in tort, the plaintiff may recover non-pecuniary losses as well, but only if he proves such losses by a preponderance of the evidence.[138]

The Louisiana Civil Code defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." [139] Fraud does not vitiate consent when the party against whom it is directed could have ascertained the truth without difficulty, inconvenience, or special skill. However, this exception does not apply when a relation of confidence reasonably induced a party to rely on the other's assertions or representations.[140] The commercial sophistication of the parties is considered by the Court when determining if a party could have ascertained the truth without difficulty, inconvenience, or special skill.[141]

The Fifth Circuit has set forth the following elements to sustain a claim for fraud under Louisiana law: (1) a misrepresentation of material fact; (2) made with the intent to deceive; and (3) causing justifiable reliance with resultant injury.[142]

**135.** La. R.S. 32:771, *et. seq.*

**136.** *See* Rec. Doc. No. 318 at 4.

**137.** *Sun Drilling Products Corp. v. Rayborn,* 2000–1884 (La.App. 4 Cir. 10/3/01), 798 So.2d 1141, 1152 *writ denied,* 2001–2939 (La.1/25/02), 807 So.2d 840. *See also Coates v. Anco Insulations, Inc.,* 2000–1331 (La.App. 4 Cir. 3/21/01), 786 So.2d 749, 756, and *Coffey v. Block,* 99–1221 (La.App. 1 Cir. 6/23/00), 762 So.2d 1181 (Caraway, J., concurring), *writ denied,* 2000–2226 (La.10/27/00), 772 So.2d 651.

**138.** *Haggerty v. March,* 480 So.2d 1064, 1068 (La.App. 5 Cir.1985).

**139.** La. Civ.Code art.1953.

**140.** La. Civ.Code art.1954.

**141.** *See Griffing v. Atkins,* 1 So.2d 445 (La. App.1941).

**142.** *Abell v. Potomac Insurance Company,* 858 F.2d 1104, 1131 n.33 (5th Cir.1988), *vacated on other grounds sub nom., Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989).

The requirement that a party justifiably rely on the alleged fraudulent misrepresentation is required to sustain the claim.[143] To determine whether or not plaintiffs' reliance was justifiable, the Court must conduct the same reasonableness inquiry it previously made on the detrimental reliance claim. A fraud claim based on unfulfilled promises or statements as to future events will not satisfy the justifiable reliance requirement. However, a claim of fraud may be predicated on promises made with the intention not to perform at the time the promise is made.[144] Thus, in order for the Court to determine whether Mercury made fraudulent misrepresentations to the plaintiffs, the Court must examine the facts and decide whether Mercury simply made unfulfilled promises, or whether Mercury never intended to honor the alleged misrepresentations it made to plaintiffs.

To prove their claim for fraudulent misrepresentation against Mercury, the plaintiffs are required to prove that (1) Mercury made misrepresentations of material fact to them during their business relationship; (2) such representations were made by Mercury Marine with the intent to deceive the plaintiffs; and (3) the plaintiffs justifiably relied on these misrepresentations and such reliance caused them injury. The plaintiffs must also prove that these misrepresentations were fraudulent. In other words, the plaintiffs must show that Mercury misrepresented facts to them or suppressed the truth in order to obtain an unjust advantage over plaintiffs or to cause plaintiffs loss or inconvenience. The plaintiffs must also show they could not have ascertained the truth without difficulty, inconvenience, or special skill based on their commercial sophistication. Finally, the plaintiffs must show that their reliance on the alleged misrepresentations was justifiable and reasonable under Louisiana law.

■ The Court finds that the plaintiffs have proven their claim for fraudulent misrepresentation by a preponderance of the evidence. Many of the factual findings the Court made in deciding the detrimental reliance claim earlier in this ruling are also applicable to the plaintiffs' claim for fraudulent misrepresentations. These prior findings are adopted by reference and will not be repeated in detail in this part of the opinion. The Court finds that Randolph did know of the possibility that Travis would become a Mercury dealer at the time that he told Glascock and Martrain the exact opposite during the meetings held at the Hilton Hotel bar and Juban's Restaurant. This conclusion is supported by the fact that Randolph was later extensively involved in signing Travis to be a Mercury dealer. He also testified that there had been talk of making Travis a Mercury dealer in the Mercury circle for the past ten years. Randolph also failed to tell Glascock and Martrain the truth once negotiations did begin with Travis. The Court finds that the statements regarding Travis were false when made because the testimony and evidence presented throughout this case supports a finding that Mercury intended to make Travis one of its dealers even when it was negotiating with plaintiffs. The testimony of Schmiedel also establishes that Mercury executives encouraged Schmiedel to give "lip service" to Mercury dealers, like Glascock and Martrain, when questioned about the possibility of Travis becoming a Mercury dealer. These facts clearly show that Mercury never intended to honor its rep-

143. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 624 (5th Cir.1993), *cert. denied, Turnbull v. Home Ins. Co.*, 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). *See also Jefferson v.* *Lead Industries Ass'n, Inc.*, 106 F.3d 1245, 1254 (5th Cir.1997).

144. *Sun Drilling, supra* at 1152.

resentations to Glascock and Martrain that Travis would not become a Mercury dealer. The Court finds as a matter of fact and law that the representations Mercury representatives made to Glascock and Martrain about Travis were not merely unfulfilled promises, but were fraudulent misrepresentations.

The Court also finds that Mercury made misrepresentations of material fact to the plaintiffs when Randolph, Schmiedel, and other Mercury representatives told plaintiffs that Travis was not going to be made a Mercury dealer or was not in the process of becoming a Mercury dealer. It is clear that these misrepresentations were made with the intent to deceive the plaintiffs. The Court's finding is supported by the evidence which established that Mercury representatives took affirmative steps to shield the truth about a possible Travis deal from Glascock and Martrain. Finally, the Court finds that the plaintiffs were justified in relying upon the misrepresentations made by the Mercury representatives.[145] Plaintiffs were also justified in believing that Mercury wanted to put all of their market power into one super-dealer who would then compete with Travis, which at the time was an OMC dealer, a big competitor of Mercury. Mercury was then able to secretly pursue Travis with the hope and expectation that the powerful marine dealer would eventually be a Mercury dealer, while at the same time, having the plaintiffs locked up as a Mercury dealer and investing time, money, and efforts to become Mercury's only dealer in the Baton Rouge market. Glascock and Martrain justifiably and properly believed Mercury's promises under the facts of this case. Thus, the plaintiffs were reasonable in relying on the misrepresentations made

to them by Mercury representatives. Therefore, the Court finds that the plaintiffs have proven their claim based on fraudulent misrepresentation by a preponderance of the evidence.

### C. The Counterclaims

Mercury has filed two counterclaims against Glascock and Martrain. Each of Mercury's claims will be discussed separately.

#### 1. Counterclaim I

Counterclaim I consists of several claims Mercury has filed against the plaintiffs. The plaintiffs have not presented any credible evidence in opposition to Mercury's claims.

Mercury's first claim is based on a promissory note signed by Glascock and Martrain in the amount of $79,117.32. The record shows Mercury is entitled to recover this amount plus attorneys fees in the amount of 10%. Mercury also seeks interest on this amount. Mercury is entitled to recover prejudgment interest from April 11, 1999 at the rate of 18% to the date of judgment. Interest from date of judgment shall be awarded as permitted by federal law.

Mercury also asserts a claim in the sum of $11,379.75 against Water Craft, Glascock and Martrain. The Court finds Mercury is subrogated to the rights of MMAC and is entitled to recover this sum from Water Craft, Glascock and Martrain. The Court also finds that Mercury is entitled to interest at the rate of 6% from the date the sum was due until the date of judgment. Interest from date of judgment until the sum is paid shall be in accordance with federal law. The Court also finds

---

**145.** This is particularly so under the facts of this case because the plaintiffs asked specific and direct questions about whether Travis would be made a Mercury dealer. Despite knowing plaintiffs wanted to know the true status of Travis' negotiations with Mercury, Mercury representatives chose to misrepresent the truth.

Mercury is entitled to attorneys fees in the sum of 10% on this claim.

Mercury seeks the sum of $3,855.12 under the 1997 and 1998 Sales and Service Agreements of Water Craft d/b/a Louisiana Boating and its guarantors, Glascock and Martrain. Mercury is entitled to recover this amount from Water Craft d/b/a Louisiana Boating, Glascock and Martrain.

Finally, Mercury seeks to collect the sum of $6,076.67 due on an open account. The Court finds Mercury is entitled to recover this sum from Glascock and Martrain.

### 2. Counter–Claim II

There is a second counterclaim asserted against Boating Centres, Inc. d/b/a Slidell Boating debt of $26,576.94 and Glascock. This sum can only be collected against Glascock under the law and facts of this case. Any claim against Boating Centres, Inc. d/b/a Slidell Boating must be asserted in a separate action. The Court finds Mercury is entitled to recover $26,576.945 with interest from the date of judgment until paid from Glascock.

### III. Summary and Conclusions

Based on the factual and legal conclusions set forth above, the Court finds that: (1) the plaintiffs have failed to prove the antitrust claims by a preponderance of the evidence; (2) even if the plaintiffs have proven their antitrust claims, Mercury has proven the meeting competition defense by a preponderance of the evidence, which absolves it of any antitrust liability; (3) plaintiffs have failed to prove their state law breach of contract claims by a preponderance of the evidence; (4) plaintiffs did prove their state law detrimental reliance, fraud, and misrepresentation claims by a preponderance of the evidence; and (5) Mercury has proven that it is entitled to recover on its counterclaim against the plaintiffs.

Finally, the Court finds it will be necessary to proceed to trial to determine the amount of damages, if any, plaintiffs are entitled to recover from Mercury. However, the Court will allow the parties to advise the Court within fifteen (15) days whether they jointly wish the Court to enter a judgment under Rule 54(b) of the Federal Rules of Civil Procedure to allow the parties to appeal the Court's decision on the liability issues at this time or whether the parties wish to proceed with the trial on damages.

Should the parties wish to now proceed with a trial to determine the extent of the plaintiffs' damages, a trial date shall be scheduled by the Court after consultation with the parties.